**BELL ATLANTIC TELEPHONE COMPANIES, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**Rochester Telephone Corporation, et al., Intervenors.**

Nos. 95–1217, 95–1219, 95–1234, 95–1239, 95–1245, 95–1258, 95–1316 and 95–1318.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 19, 1995.

Decided March 29, 1996.

---

Mark L. Evans, Washington, DC, argued the cause for petitioners and intervenors challenging the "price cap" rules. With him on the briefs were James R. Young, Michael E. Glover, Edward H. Shakin, Arlington, VA, Robert M. Lynch, San Antonio, TX, Durward D. Dupre, St. Louis, MO, Thomas A. Pajda, St. Louis, MO, Linda Kent, Charles Cosson, Michael J. Shortley, III, Arlington, VA, Lucille M. Mates, John W. Bogy, James L. Wurtz, San Francisco, CA, Margaret E. Garber, Reno, NV, Richard McKenna, Irving, TX, M. Edward Whelan, III, Los Angeles, CA, M. Robert Sutherland, Atlanta, GA, Robert B. McKenna, Denver, CO, Saul Fisher, Bedminster, NJ, Joseph DiBella, White Plains, NY and Rodney L. Joyce, Washington, DC. David J. Gudino, Washington, DC, entered an appearance.

Paul T. Cappuccio, Washington, DC, argued the cause for petitioners and intervenors challenging the "add-back" order. With him on the briefs were Steven G. Bradbury, Lawrence R. Sidman, Washington, DC, Michael S. Pabian, Hoffman Est, IL, M. Robert Sutherland, Atlanta, GA, Robert M. Lynch, San Antonio, TX, Durward D. Dupre, Thomas A. Pajda, St. Louis, MO, James R. Young, Michael E. Glover, Edward H. Shakin and Michael J. Shortley, III, Arlington, VA.

John E. Ingle, Deputy Associate General Counsel, Washington, DC, Federal Communications Commission, argued the cause for respondents. With him on the briefs were William E. Kennard, General Counsel, Daniel M. Armstrong, Associate General Counsel, Laurence N. Bourne, and Carl D. Lawson, Counsel, Anne K. Bingaman, Assistant Attorney General, United States Department of Justice, Robert B. Nicholson and Robert J. Wiggers, Attorneys, Washington, DC.

Gene C. Schaerr, Washington, DC, argued the cause for intervenors in support of respondents. With him on the briefs were Mark C. Rosenblum, Peter H. Jacoby, Basking Ridge, NJ, Frank W. Krogh, Donald J. Elardo, Harold R. Juhnke, Jay C. Keithley and James S. Blaszak, Washington, DC.

E. Edward Bruce, John F. Duffy, Washington, DC, Saul Fisher, Bedminster, NJ, and Joseph DiBella, White Plains, NY, were on the brief in support of respondents on

behalf of intervenors New York Telephone Company and New England Telephone and Telegraph Company.

Before: SILBERMAN, BUCKLEY, and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Petitioners, a group of local telephone exchange carriers, seek review of two orders of the Federal Communications Commission. These orders—the *Performance Review Order*[1] and the *Add–Back Order*[2]—made several changes to the Commission's scheme for regulating prices charged by local telephone companies for interstate access services. We deny the petitions for review because the orders are neither arbitrary nor capricious and have no impermissible retroactive effects.

I

A. Background

In 1990, the Commission implemented a price cap plan for regulating rates charged by local telephone exchange carriers for interstate access services.[3] Under the price cap plan, the carriers' services are grouped into baskets. For each basket, the Commission established a maximum price, called the price cap index. As long as a carrier's tariffed rates remain below the price cap index, its rates go into effect after substantially streamlined review. Price cap regulation is intended to provide better incentives to the carriers than rate of return regulation, because the carriers have an opportunity to earn greater profits if they succeed in reducing costs and becoming more efficient. *See generally National Rural Telecom Ass'n v. FCC,* 988 F.2d 174 (D.C.Cir.1993).

The price cap rules required annual adjustments to the carriers' price cap indices for inflation and certain "exogenous" changes outside the carriers' control, coupled with a percentage offset for anticipated productivity gains. The productivity offset was necessary because the telecommunications industry had experienced faster productivity growth than the economy generally. As adopted in 1990, the price cap rules required the carriers to use a minimum productivity offset (or "X-factor") of 3.3 percent.

The Commission derived the productivity offset from two studies of historical productivity growth. The first, known as the Frentrup–Uretsky study, concluded that local exchange carrier productivity growth over the post–1984 period had been 3.5 percent annually. *LEC Price Cap Order,* 5 F.C.C.R. at 6797 ¶¶ 83–84. (1984 had been a watershed year, because in that year the Bell System divested its local exchange operations, which created many of the local exchange carriers in their present-day incarnations.) The second study, known as the Spavins–Lande study, examined long term productivity and concluded that productivity growth in the industry had been 2.1 percent annually over the period 1928–1989. *Id.* at 6797–98 ¶¶ 90–95. The Commission decided that both measures of productivity growth were relevant, and used an average of the two numbers (2.8 percent) as the basis for the historical component of the X-factor.

The Commission expected, however, that incentive regulation would result in greater productivity gains than rate of return regulation, and therefore added a 0.5 percent "consumer productivity dividend" to the original X-factor, for a total of 3.3 percent. *LEC Price Cap Order,* 5 F.C.C.R. at 6799 ¶ 100. No party to the original proceeding challenged either the overall method for determining the productivity offset, or this specific

1. *Price Cap Performance Review for Local Exchange Carriers,* First Report and Order, 10 F.C.C.R. 8961 (1995) (*"Performance Review Order"*).

2. *Price Cap Regulation of Local Exchange Carriers: Rate-of-Return Sharing and Lower Formula Adjustment,* Report and Order, 10 F.C.C.R. 5656 (1995) (*"Add–Back Order"*).

3. *See generally Policy and Rules Concerning Rates for Dominant Carriers,* Second Report and Order, 5 F.C.C.R. 6786 (1990) (*"LEC Price Cap Order"*), recons., 6 F.C.C.R. 2637 (1991) (*"Reconsideration Order"*), aff'd sub nom. *National Rural Telecom Ass'n v. FCC,* 988 F.2d 174 (D.C.Cir.1993).

component of that offset. *See National Rural Telecom Ass'n v. FCC.*

The Commission was concerned that these offsets might not accurately reflect the local exchange carriers' productivity growth. *LEC Price Cap Order,* 5 F.C.C.R. at 6801 ¶ 120. The Commission feared that if the productivity offset was too low, for example, the annual reduction in the price caps would not keep pace with the local exchange carriers' productivity gains, and therefore consumers would not fully share in the benefits of incentive regulation, and could wind up worse off than they would have been if traditional rate of return regulation had been in effect.

In order to reduce this risk, the Commission adopted as a backstop program the sharing adjustment, the general validity of which is not disputed here. *Id.* Sharing entails a one-time adjustment to a local exchange carrier's price cap index when its rate of return for the previous year has been abnormally high.[4] The Commission reasoned that, in a year in which a local exchange carrier's earnings are particularly high, the carrier's productivity offset will probably have understated that local exchange carrier's actual gains in efficiency. *Reconsideration Order,* 6 F.C.C.R. at 2684 ¶ 102. Therefore, a correction in the price cap index for future rates is necessary in order to allow consumers to "share" in this additional, unanticipated productivity gain in the succeeding year. The Commission uses a percentage (usually 50 percent) of the local exchange carrier's earnings over a certain threshold as a proxy for determining this additional productivity gain, and requires that the local exchange carrier's price cap

index (though not necessarily its rates) be reduced by this amount during the following year.

The Commission established a minimum X-factor of 3.3 percent, but allowed carriers to choose each year between a 3.3 percent offset and a 4.3 percent offset. *LEC Price Cap Order,* 5 F.C.C.R. at 6787–88 ¶¶ 5–8. If a carrier chose the higher 4.3 percent offset its price caps would increase less, but it would be subject to a higher sharing threshold, allowing it to retain more of its earnings.[5]

The Commission did not envision that sharing would be routine. *See id.* at 6801 ¶¶ 120–21; *Performance Review Order,* 10 F.C.C.R. at 9051 ¶ 203. In practice, however, sharing became routine: in 1993 alone, the great majority of price cap local exchange carriers were in the sharing zone, including all seven Bell Operating Companies. *Id.*

## B. The Performance Review Order

In the original price cap orders, the Commission stated that it would undertake a thorough "performance review" after the first four years of price cap regulation to evaluate how well the system had worked. *LEC Price Cap Order,* 5 F.C.C.R. at 6834 ¶¶ 385–88. Accordingly, in 1994 the Commission initiated a rulemaking proceeding that produced the *Performance Review Order.*

The Commission sought comment on what local exchange carrier productivity had been under price caps and what the X-factor should be in the future. In response, United States Telephone Association ("USTA"), on behalf of most local exchange carriers, submitted a study that proposed to determine

4. In addition to the sharing adjustment, the Commission adopted a mechanism known as the "low-end" adjustment. This mechanism mirrors the sharing adjustment: When a local exchange carrier's earnings are particularly low, the productivity offset has likely overstated the local exchange carrier's actual efficiency gains, and the local exchange carrier is therefore permitted to correct for that overstatement by increasing the following year's price cap index.

5. For example, under the original *LEC Price Cap Order* if a local exchange carrier chose the 3.3 percent offset, it was required to "share" 50 percent of any returns above 12.25 percent, and

100 percent of any returns above 16.25 percent. Thus, if a local exchange carrier chose the 3.3 percent offset and achieved a 13.25 percent return in a given year, it would be allowed to keep the entire profit from that year, but it would have to make a one-time reduction in its price cap index the following year in order to recognize the fact that its productivity had increased faster than the Commission had predicted. *LEC Price Cap Order,* 5 F.C.C.R. at 6787–88 ¶¶ 7–8. For local exchange carriers that chose the 4.3 percent productivity offset, 50 percent sharing began at 13.25 percent and 100 percent sharing at 17.25 percent. *Id.*

the productivity factor based on a "total factor productivity" method ("TFP"). According to the USTA study (as revised), local exchange carrier productivity growth had been 2.3 percent. Other parties challenged USTA's proposal, contending that there were serious conceptual and methodological problems with its proposed TFP methodology. *See id.* at 9014–18 ¶¶ 117–26.

MCI also submitted a study based on a correction of what it saw as errors in the Commission's original determination of the X-factor. In 1990, there had been significant controversy about the Commission's decision to include the 1984 data point in the Frentrup–Uretsky study. The 1984 data point was a statistical "outlier," but the Commission had retained it, erring on the side of including all relevant information. MCI argued that the Frentrup–Uretsky study should now be recalculated without the 1984 data point, and that the results should not be averaged with the long term Spavins–Lande study. MCI thus concluded that local exchange carrier productivity was actually around 5.9 percent. *Id.* at 9022–23 ¶¶ 134–36.

In the *Performance Review Order,* the Commission reached two principal conclusions with respect to the determination of the X-factor. First, the Commission concluded that the record developed in the Performance Review was insufficient to make a final or permanent determination about local exchange carrier productivity under price caps. The Commission stated that it was "persuaded that [it] must develop a new productivity factor to replace the X-factor in the current price cap formula," but that the record only permitted it to sketch out the "broadest features of the new X-factor." *Performance Review Order,* 10 F.C.C.R. at 9026–27 ¶ 145. The Commission analyzed all of the proposed methodologies for determining local exchange carrier productivity and decided that there were too many outstanding questions to render any final judgment. *Id.* at 9026–34 ¶¶ 144–64. Without a methodology to determine productivity, the Commission could not determine a new, permanent X-factor. Therefore, the Commission decided to issue a further notice of proposed rulemaking to explore these issues and to set a permanent X-

factor for the future. *See, e.g., Price Cap Performance Review for Local Exchange Carriers,* CC Docket No. 94–1, Fourth Further Notice of Proposed Rulemaking, released September 27, 1995 (seeking further comment on establishing a new productivity offset).

Second, having concluded that it was presently unable to determine a permanent X-factor, the Commission chose an interim offset to be used while the further rulemaking was pending. *Performance Review Order,* 10 F.C.C.R. at 9050–54 ¶¶ 198–209. Because the Commission had deferred consideration of all of the post-price cap studies in the current record, it decided to extend the current transitional arrangement, in which the X-factor is based on pre-price cap productivity studies. As explained earlier, the present X-factor was determined by averaging the results of the Frentrup–Uretsky study and the Spavins–Lande study of local exchange carrier productivity under rate of return regulation, and adding a 0.5 percent consumer productivity dividend for the expected increase in productivity under price cap regulation. The Commission used this same general methodology to determine the new, interim X-factor. *See id.* at 2053–54 ¶ 209.

The Commission made one change to the original X-factor. During the first four years of incentive regulation, the local exchange carriers' earnings routinely reached the sharing levels. The Commission had not anticipated this, and the local exchange carriers' consistently increasing earnings were an indication that the Commission's original X-factor had been set too low. In the *Performance Review Order,* the Commission decided to exclude the 1984 data point from the Frentrup–Uretsky study. The Commission had originally decided to use the data point despite the fact that it was a statistical outlier and over the strong objections of commenters. In light of actual experience under price caps, the Commission decided that the inclusion of the 1984 data point had been a mistake. The Commission therefore recalculated the Frentrup–Uretsky study without the 1984 data point. *See id.* at 9050–53 ¶¶ 201–08, and App.D. With this change, but

applying essentially the original methodology, the Commission established an interim, minimum X-factor of 4.0 percent (rather than the old 3.3 percent).

Because the Commission determined that it had erred in 1990 in its selection of the minimum X-factor, it also ordered a one-time price cap adjustment for all local exchange carriers that had chosen the 3.3 percent offset. For each year a carrier had elected the 3.3 percent offset between 1990–1994, the Commission ordered the carrier to take a 0.7 percent reduction in its price cap index prospectively. The adjustment placed a local exchange carrier's future price cap index where it would have been had the X-factor been 4.0 percent all along. *Id.* at 9069–73 ¶¶ 245–54.

The Commission also established two other X-factor options for the interim period: 4.7 percent and 5.3 percent. If a local exchange carrier chooses 4.7 percent, its sharing thresholds are higher; if a local exchange carrier chooses 5.3 percent, it will have no sharing requirements. *Id.* at 9054–58 ¶¶ 210–22. Both AT & T and MCI have filed petitions for reconsideration, contending that the Commission erred by not establishing a *higher* interim X-factor.

The *Performance Review Order* also amended the Commission's rules to preclude price cap index adjustments for accounting changes that involve no changes in economic cost "expected to affect prices...." *See generally id.* at 9090 ¶¶ 293–94. One such change, mandated by the Financial Accounting Standards Board, related to the treatment of "other post-employment benefits." Generally accepted accounting principles had permitted companies to record these costs when paid. Beginning December 15, 1992, companies had to account for post-employment benefits other than pensions on an accrual basis. In response to this accounting change, several local exchange carriers made an upward adjustment in their price cap indices to reflect the annual, amortized amount of this new accounting "cost." The Commission disallowed the adjustment, but

this court reversed on the ground that the Commission's rules in effect at the time permitted it. *Southwestern Bell Tel. Co. v. FCC,* 28 F.3d 165 (D.C.Cir.1994). Applying the new rule in the *Performance Review Order,* the Commission ordered the price cap indices reduced prospectively, in order to preclude recovery of future, amortized installments of other post employment benefit costs. *Performance Review Order,* 10 F.C.C.R. at 9095–96 ¶¶ 307–09.

### C.  The Add–Back Order

In 1993, a dispute arose about how to account for sharing adjustments in subsequent years. Some local exchange carriers had achieved high earnings in 1991, which resulted in sharing obligations for 1992. These local exchange carriers then calculated their sharing obligations for 1993 based on post-sharing 1992 earnings, rather than pre-sharing earnings.[6] The Common Carrier Bureau immediately initiated a still-pending tariff investigation to examine the legality of this practice. At about the same time, the Commission initiated a rulemaking proceeding, which resulted in the *Add–Back Order* under review here.

In the *Add–Back Order,* the Commission explained that a sharing adjustment made in Year 2 to recognize productivity gains achieved in Year 1 had to be "added back" to Year 2 revenues in order to calculate Year 2 productivity gains (and thus the Year 3 sharing obligation). The Commission explained that "ignoring the effects of a sharing adjustment will make a local exchange carrier's earnings, and therefore its productivity, appear to be lower than it actually is during the year in which the sharing amount is flowed through to ratepayers." *Add–Back Order,* 10 F.C.C.R. at 5660 ¶ 23. The Commission reasoned that failing to adopt an add-back rule would result in ripple effects from year to year, and would allow the local exchange carriers effectively to reduce their total sharing obligations to a percentage below that required by the Commission's price cap rules. *Id.* at 5661–62 ¶¶ 33–35.

---

**6.** NYNEX, which had low earnings during this period and which took advantage of the low-end adjustment, did apply the add-back principle.

The Commission claimed that the add-back rule had been implicit in the sharing rules from the beginning, stating that an "add-back requirement is not only fully consistent with, but also an essential element of, the system of price cap regulation." *Id.* at 5661 ¶ 32. The *Add–Back Order,* which was issued in 1995, required the local exchange carriers to recalculate their 1994 earnings using the add-back rule when determining their sharing price caps for 1995. *Id.* at 5665 ¶ 49.

## II

■ Section 201(b) of the Communications Act, 47 U.S.C. § 201(b), declares that charges for interstate or foreign communications "shall be just and reasonable," and § 202(a) of the Act, 47 U.S.C. § 202(a), prohibits carriers from engaging in "unreasonable discrimination," giving "any undue or unreasonable preference," or subjecting persons or localities "to any undue or unreasonable prejudice or disadvantage." The generality of these terms—unfair, undue, unreasonable, unjust—opens a rather large area for the free play of agency discretion, limited of course by the familiar "arbitrary" and "capricious" standard in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Judicial explications of this standard basically boil down to one simple proposition—agency action is arbitrary and capricious if the agency has, in the eyes of the court, committed a "clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). Whether we examine only the "end result" of the Commission's ratemaking in this case, *see FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 287–88, 88 L.Ed. 333 (1944), or each of its contested elements, *see Public Service Comm'n v. FERC,* 813 F.2d 448, 465 & n. 27 (D.C.Cir.1987), we come to the same conclusion. Petitioners have failed to establish any clear error underlying the Commission's orders.

### A. The Performance Review Order

■ 1. *The Interim X–Factor.* To sustain petitioners' attack on the interim X-factor we would have to determine that the Commission committed a clear error in judgment in selecting 4.0 as the factor needed to produce just and reasonable rates. Petitioners insist that the Commission made such a mistake, caused partly by its exclusion of the 1984 data point in the Frentrup–Uretsky study despite the Commission's earlier judgment in the 1990 price cap order to include it. Everyone agrees that an agency's change of mind does not itself render the agency's action arbitrary. *See Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971). What matters is the Commission's explanation for its decision.

The Commission originally predicted that sharing would be rare, serving merely as a backstop "in the event that unanticipated errors in the price cap formula, or circumstances peculiar to a particular company, rendered the formula inaccurate for a company at a given time." *Performance Review Order,* 10 F.C.C.R. at 9051–52 ¶ 203. In practice, however, sharing had become routine. By 1993, all seven Bell Operating Companies were in the sharing zone, leading the Commission to believe that the original X-factor had been too low. *Id.* Moreover, a 1995 Commission study based on data submitted by the United States Telephone Association (the Appendix F study) indicated that the productivity growth rates for 1984–1990 were "significantly higher than the Frentrup–Uretsky results for the same period." *Id.* at 9052 ¶ 204. The Appendix F study came up with a productivity figure of 4.8 percent for the 1985–90 post-divestiture period; Commission analysis of the Frentrup–Uretsky study without the 1984 data point showed that "the short-term historical X-Factor would have been 5.0 percent." The USTA data, adjusted for input price differential, thus generally corroborated this revision of the Frentrup–Uretsky study. *Id.* at 9053 ¶ 207. Moreover, the Appendix F study showed "no unusual or out-of-trend growth for the 1984–85 period, lending additional weight to the view that the 1984/85 data provided to the Commission in the original proceeding was erroneous and should be ex-

cluded." *Id.* at 9160; *see also id.* at 9053 ¶ 207.

The Commission acknowledged the doubts it had about including the 1984 data point in the first place, calling this "perhaps, the single most contentious aspect of our productivity analysis" because the data point was a statistical outlier that "did not fit the trend described by the 1985–90 data." *Id.* at 9052 ¶ 205. While the Commission ultimately included the data point in its 1990 X-factor in view of its relevance, this decision "was not compelled by the evidence" and just as reasonably could have gone the other way. *Id.* The Commission thus had good reason for concluding in 1995, based on its experience under price cap regulation, that "exclusion of the 1984 data point [would] provide a more reliable measure of [local exchange carrier] productivity in the immediate post-divestiture period." *Id.* at 9052 ¶ 205. As the Commission aptly put it in its Brief, "[o]ne Commission decided to include a suspicious data point because it was relevant, a later Commission decided to exclude a relevant data point because it was suspicious. Both decisions are rational and the decision to include the relevant but suspicious data point should not be viewed as more rational or as binding on the later Commission merely because it occurred at an earlier date." Brief for the Respondents at 35.

Petitioners also claim that, in revising the X-factor, the Commission should have considered new data reflecting the performance of local exchange carriers under price caps, rather than focusing only on the carriers' performance under rate-of-return regulation during the 1984–90 period. The Commission tentatively decided that, in the future, the X-factor would be based on local exchange carrier productivity growth under price caps. The Commission viewed the current record,

however, as insufficient to determine a new, permanent X-factor. Indeed, the Commission had not even settled on a permanent methodology for determining productivity under price caps. *See Performance Review Order,* 10 F.C.C.R. at 9026–34 ¶¶ 144–64. Numerous methodological issues had to be resolved before the Commission could rely on the USTA study in particular, or upon post-price cap data in general.[7] *See id.* at 9031 ¶ 155. The Commission therefore decided to issue a Further Notice of Proposed Rulemaking and to ask for more comments on its proposed methodology. *Id.* at 9026 ¶ 144. *See Price Cap Performance Review for Local Exchange Carriers,* CC Docket No. 94–1, Fourth Further Notice of Proposed Rulemaking, released September 27, 1995.

Having rejected the new studies on the ground that the record was insufficient to make a permanent judgment about productivity, the Commission reasonably decided to continue the present system during the interim period. *See Performance Review Order,* 10 F.C.C.R. at 9053–54 ¶ 209. That system is based on an average of the Frentrup–Uretsky and the Spavins–Lande studies of historical (*i.e.,* pre-price cap) productivity, plus a 0.5 percent "consumer productivity dividend." Post-price cap data is simply not relevant to that calculation. Arguably, the Commission could have attempted to change the current methodology in order to incorporate the post-price cap data into the interim X-factor calculation. In light of the interim nature of the decision and the methodological problems with the post-price cap data, however, the Commission's decision to stick with its original methodology on an interim basis scarcely amounted to a clear error in judgment.[8]

7. These issues included: how to construct an industry-wide sample; whether to use an input price differential; whether to use total company or only interstate data; and which public sources of economic data are valid for these purposes. *See Performance Review Order,* 10 F.C.C.R. at 9026–34 ¶¶ 144–64. The resolution of any one of these issues could dramatically affect the data used, and the resulting estimation of local exchange carrier productivity.

8. Petitioners' attack on the Commission's reliance upon a re-analysis of some of the USTA data on local exchange carrier productivity prior to price caps does not change the result. The Commission based its decision only on the pre-price cap data. The Commission staff reanalyzed the data to take into account input price differentials. And the Commission relied on the Appendix F study only in "a general way." *Performance Review Order,* 10 F.C.C.R. at 9053 ¶ 207.

Petitioners also protest the 0.5 percent consumer productivity dividend included in the interim X-factor. It is true that the Commission provided no specific reason for retaining a consumer productivity dividend or for setting the figure at 0.5 percent. But as we have already discussed, the Commission offered a thorough and convincing explanation of why it was retaining its original methodology on an interim basis. The 0.5 percent consumer productivity dividend was part of that original methodology and neither AT & T nor the local exchange carriers contested it before it went into effect pursuant to the 1990 order.

Having found the record insufficient to select a new methodology and having issued a Further Notice of Proposed Rulemaking, the Commission continued using its current methodology in the interim with two changes. The Commission adjusted the historical component of the X-factor upward and gave local exchange carriers a wider range of X-factors from which to choose. *Id.* at 9050 ¶ 199. The local exchange carriers' experience under price caps indicated that these aspects of the original plan demanded immediate attention. With so many local exchange carriers in the sharing zone, the Commission had good reason to believe that the original X-factor had been too low and therefore adjusted it upward. *See id.* at 9050–54 ¶¶ 201–09. And because so few local exchange carriers had chosen the optional X-factor and in light of the diversity of local exchange carrier performance under price caps, the Commission decided to change the options available to local exchange carriers. *See id.* at 9054–64 ¶¶ 210–34. With the exception of those two changes, the Commission retained the same X-factor methodology on an interim basis and deferred other major changes until the record was more complete. Its decision in this respect was within the bounds of the discretion entrusted to it.

■ 2. *"Other post employment benefit" costs.* Petitioners argue that the Commission erred in denying "exogenous" treatment[9] for the change in their method of accounting for other post employment benefit costs. The argument is two-fold: the Commission's new rule arbitrarily gives exogenous treatment to costs that lower carriers' price cap indices while it refuses to give exogenous treatment to costs that would increase price cap indices; and the new rule is inconsistent with *Southwestern Bell v. FCC*, 28 F.3d 165 (D.C.Cir.1994). These objections are unfounded. The Commission's earlier rule had applied to all changes in generally accepted accounting principles adopted by the Financial Accounting Standards Board. Only changes that were already reflected in the inflation measure used to determine the price cap index—and thus would result in double counting if they were given exogenous treatment—were excepted. Under the Commission's new rule, if an accounting change results in "only a change in how books are kept and costs are recorded," it will be denied exogenous treatment. *Id.* at 9085 ¶ 282. On the other hand, accounting changes that result "in an economic cost change that might be expected to affect prices in competitive markets" will be given exogenous treatment. *Performance Review Order*, 10 F.C.C.R. at 9090 ¶ 293. We therefore fail to see any discrimination of the sort petitioners imagine. As to *Southwestern Bell*, the court made it clear that the Commission was free to change its existing rule. 28 F.3d at 173. And that is what the Commission did in the *Performance Review Order*.

■ 3. *Retroactivity.* The *Performance Review Order* required local exchange carriers to make two adjustments to their price cap indices. Carriers who had chosen the 3.3 percent X-factor had to adjust their price cap indices downward so that their future rates would be at the level they would have been if

---

**9.** In the *LEC Price Cap Order,* the Commission determined that certain costs incurred by LECs caused by administrative, legislative or judicial requirements beyond the control of the carriers should result in an adjustment to the PCI to ensure that the price cap formula does not lead to unreasonably high or unreasonably low rates. The Commission found that a decision not to recognize these costs in the PCI would either unjustly punish or reward the carrier by incorrectly treating them as changes in the carrier's level of efficiency. The Commission called these costs "exogenous" or "Z Factor" costs.
*Performance Review Order,* 10 F.C.C.R. at 9080–81 ¶ 274 (footnotes omitted).

the X-factor had been 4.0 percent all along. *Id.* at 9069–73 ¶¶ 245–56. And carriers who had adjusted their price cap indices upward to reflect changes in their accounting for other post employment benefit costs were required to adjust their price cap indices downward to eliminate the previous change. *Id.* at 9096 ¶ 309. Petitioners think the Commission engaged in impermissible retroactive rulemaking when it required these adjustments. We think not.

In both instances the Commission stated that the changes would affect future rates only and were not intended to reclaim revenues carriers had earned in previous years. *Id.* at 9071–72, 9096 ¶¶ 252, 309. The one-time adjustments brought the price cap indices to a level that—according to the Commission—accurately reflected the carriers' costs and productivity, and prevented past Commission mistakes from being embedded in future rates. As the Commission put it, the "one-time adjustment merely ensures that, in the future, higher earnings must be attained through actual improvements in productivity and will not continue to accrue as a result of administrative error." *Id.* at 9072 ¶ 252. The adjustments therefore have no retroactive effect. *See Administrators of the Tulane Educational Fund v. Shalala,* 987 F.2d 790, 798 (D.C.Cir.1993). And they do not upset petitioners' reliance interests. In 1990, the Commission announced its plan to conduct a performance review in 1994 to assess how well the price cap system had worked. *LEC Price Cap Order,* 5 F.C.C.R. at 6834 ¶¶ 385–88. Petitioners made all of their X-factor elections with that in mind. Petitioners could not have reasonably assumed that the price cap index would not be altered.

### B. The Add–Back Order

The *Add–Back Order* addresses the following question. Suppose a carrier incurred a sharing obligation in Year 1 which resulted in a lower price cap index in Year 2. In determining the carrier's price cap for Year 3, how should the Commission calculate the carrier's earnings in Year 2? In the *Add–Back Order,* the Commission decided to add the amount of the previous year's sharing obligation to the carrier's "actual" earnings in Year 2 in order to determine what the carrier's earnings would have been if it had not been required to reduce its price caps in Year 2.

The Commission found that the add-back requirement was a necessary element of the sharing mechanism. *Add–Back Order,* 10 F.C.C.R. at 5661–63 ¶¶ 29–37. The purpose of the sharing mechanism was to ensure that carriers achieving unusually high productivity growth would share the benefits of that growth with their customers through lower price caps. *Id.* at 5657 ¶ 7. The Commission used the carrier's rate of return as an indirect measure of its productivity gains. Thus, since rate of return is based on earnings, the sharing mechanism assumes a link between productivity growth and earnings. The Commission reasoned that without the add-back rule, that link would be broken. *Id.* at 5663 ¶ 41. A carrier who earned less in Year 2 because its price caps were reduced as a result of a previous year's sharing obligation would seem less productive than it actually was. *Id.* at 5660 ¶ 23. The Commission also reasoned that without add-back, the sharing adjustment—which was intended to be a one-time adjustment—would continue to affect a carrier's price caps year after year because the carrier's earnings, rather than reflecting the carrier's true productivity, would simply reflect the previous year's sharing obligation. *Id.* at 5661–62 ¶¶ 33–35.

■ Petitioners dispute the Commission's explanation. They claim that the add-back requirement is arbitrary and capricious because it requires carriers to recognize "phantom" earnings and because it requires carriers to share more than the original price cap rules intended. Neither of these objections strikes us as persuasive.

According to the Commission, adding a carrier's "actual" earnings to its previous year's sharing obligation to calculate its earnings results in a more accurate reflection of the carrier's productivity for that year, which in turn results in a fairer price cap for the next year. The Commission uses earnings as a proxy for measuring a carrier's productivity; the add-back rule maintains the link between productivity and earnings. That the carrier did not actually earn the add-back amount is beside the point. The add-back

amount provides useful information about the carrier's productivity because it reflects what the carrier could have earned but for the sharing obligation.

To support their argument that the add-back requirement requires them to share too much, petitioners offer the case of a carrier who earns enough to incur a sharing obligation in Year 1, but earns just below the threshold amount in the following years. The carrier will then have to continue sharing year after year because of the add-back requirement. For instance, a carrier who earns $1 million more than the threshold amount in Year 1 will have to share $500,000 in Year 2. In Year 2, if the carrier earns just less than the threshold amount, it will still be in the sharing zone because it will have to add back the $500,000. Thus, it will have to share $250,000 in Year 3. This pattern will continue until the carrier has shared almost 100 percent of the $1 million, rather than the 50 percent intended by the original sharing rules.

The Commission recognized that the carrier would have to continue sharing year after year, but thought this made sense. As the Commission saw it, the add-back rule does not create a ripple effect. It erases the ripple effect of the sharing mechanism. *Add–Back Order,* 10 F.C.C.R. at 5662 ¶ 34. In the petitioners' example, the carrier does not continue to share because of the add-back, but because once the carrier's earnings are adjusted to erase the effect of the previous year's sharing obligation, the carrier's earnings remain in the sharing zone. *Id.* at 5662 ¶ 35. That is, the carrier would have been in the sharing zone in Year 2 if it had not reduced its price caps to satisfy a sharing obligation incurred in Year 1. The Commission recognized and intended that add-back would increase carriers' sharing obligations in some circumstances. The Commission found that add-back resulted in the right level of sharing, and that it was a necessary part of the sharing mechanism. Petitioners offer no basis for overturning that decision. They simply argue that the add-back requirement requires them to share too much. The Commission reasonably decided otherwise.

Petitioners also object to the *Add–Back Order* on the ground that it violates the Communications Act by forcing carriers to refund lawful earnings. In the *Add–Back Order,* the Commission compared the sharing mechanism to a system in which the carrier writes a check on the last day of the year instead of reducing its rates in the next year. *See Add–Back Order,* 10 F.C.C.R. at 5659–61 ¶¶ 17–28. The Commission showed that sharing with an add-back rule was similar to the check-writing system, while sharing without an add-back rule was not. According to petitioners, this reasoning shows that the add-back rule converts the sharing adjustment into a refund. But the add-back rule does not change the fundamental nature of the sharing mechanism. With or without the rule, the sharing mechanism is still a prospective adjustment designed to allow customers to share prospectively in the local exchange carrier's unanticipated productivity gains. The Commission merely compared the sharing mechanism to the check-writing system to show that the add-back rule—like the check-writing system—eliminated the effect of the previous year's sharing obligation from the calculation of the current year's earnings. That the Commission drew an analogy between these two systems in the *Add–Back Order* does not transform the prospective cap adjustments into backward-looking refunds.

The *Add–Back Order* required local exchange carriers to use the add-back rule to adjust their 1994 earnings to determine their 1995 price caps. *Id.* at 5665 ¶ 49. According to petitioners, the requirement that carriers recalculate past earnings under this new rule renders the order impermissibly retroactive because it increases the carriers' liability for past transactions and changes the consequences of earlier decisions. But the *Add–Back Order* is not retroactive. The sharing rules, including the add-back rule, are purely prospective. They determine how much a carrier can charge for services that it will provide in the future. They do not render current tariffs unlawful, and they do not require carriers to refund money they have already earned. Rather, the sharing rules draw upon the "antecedent facts" of a local

exchange carrier's prior earnings and sharing obligations—and what those earnings indicate about the local exchange carrier's productivity—in establishing the local exchange carrier's sharing obligation for the next period. A regulation is not made retroactive "merely because it draws upon antecedent facts for its operation." *Landgraf v. USI Film Products,* —— U.S. ——, —— n. 24, 114 S.Ct. 1483, 1499 n. 24, 128 L.Ed.2d 229 (1994) (quoting *Cox v. Hart,* 260 U.S. 427, 435, 43 S.Ct. 154, 157, 67 L.Ed. 332 (1922)). While a rule may be retroactive if it increases a party's liability for past conduct, —— U.S. at ——, 114 S.Ct. at 1503, the Commission has not increased any carrier's liability for past transactions. Simply put, the sharing rules do not *create* any liability. The sharing rules do not regulate past transactions; they regulate future rates. *See id.* at ——, 114 S.Ct. at 1524 (Scalia, J., concurring in judgment). They are not designed to deter or prevent a carrier from earning too much in Year 1; rather they ensure that the rates in Year 2 are fair by looking at certain antecedent facts. If a carrier went out of business at the end of Year 1 it would face no liability, no matter how high its earnings were that year.

This court has viewed similar rules as prospective. In *Association of Accredited Cosmetology Schools v. Alexander,* 979 F.2d 859, 863–66 (D.C.Cir.1992), the Department of Education issued a rule that based schools' eligibility to participate in federal loan programs on their loan default rate. The Department examined default rates before the effective date of the regulations to determine whether schools were eligible for the year 1992. *Id.* at 861–62. The court held that the rule was not retroactive because it did not "undo[ ] past eligibility," but merely "look[ed] at schools' past default rates in determining future eligibility." *Id.* at 865. In *Administrators of the Tulane Educational Fund v. Shalala,* 987 F.2d 790 (D.C.Cir.1993), the Department of Health and Human Services issued rules in 1989 requiring hospitals to reaudit certain Medicare costs for 1984 and to use the costs in that base period to calculate reimbursements for future years. The court held that the regulations had no retroactive effect because they "contemplate only

the use of past information for subsequent decisionmaking." *Id.* at 798.

Moreover, the add-back rule does not change the past legal consequences of carriers' decisions to choose the 3.3 percent X-factor rather than the 4.3 percent X-factor. Each year, local exchange carriers were allowed to choose between a 3.3 percent X-factor and a 4.3 percent X-factor. Carriers who chose the 3.3 percent X-factor could charge more, but their sharing obligations were triggered at a lower level. Because of this lower sharing threshold, the add-back rule is more likely to affect carriers who chose the 3.3 percent X-factor. While the rule may disfavor one choice, it is still not retroactive. The add-back rule has only future effect. It is used to determine future rates, and does not change or invalidate any current tariffs.

Therefore, any retroactive effect is only secondary, and the rule is valid as long as it is reasonable, which it is. *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 220, 109 S.Ct. 468, 477–78, 102 L.Ed.2d 493 (1988) (Scalia, J., concurring). The rule does not upset petitioners' reasonable reliance interests. The state of the law has never been clear, and the issue has been disputed since it first arose in 1993. In 1993, some carriers filed their tariffs using the add-back rule, and others did not. The Commission's Common Carrier Bureau specifically designated the issue for investigation. *See 1993 Access Tariff Filings,* Memorandum Opinion and Order, 8 F.C.C.R. 4960, 4965 ¶¶ 30–32 (1993). Petitioners made their X-factor decisions in the face of considerable uncertainty about whether the 1990 *LEC Price Cap Order* included add-back. Furthermore, the rule does not "make worthless substantial past investment incurred in reliance upon the prior rule." *Bowen,* 488 U.S. at 220, 109 S.Ct. at 477 (Scalia, J., concurring). The rule gives petitioners the benefit of their bargain. Petitioners who chose the 3.3 percent offset in previous years have already received the benefit of that decision through higher price caps in those years. In light of the Commission's decision that the add-back rule was needed to avoid the distorting effect of the sharing mechanism and to judge local ex-

change carriers' productivity accurately, the Commission properly decided to implement the rule prospectively.

\* \* \*

Because we find that the Commission's decisions in the *Performance Review Order* and the *Add–Back Order* were reasonable and supported by the record, and because neither order had any impermissible retroactive effects, the petitions for review are

*Denied.*