United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued January 20, 1999 Decided May 21, 1999 

 No. 97-1469

 United States Telephone Association, et al., 

 Petitioners

 v.

 Federal Communications Commission and 

 United States of America, 

 Respondents

 AT&T Corporation, et al., 

 Intervenors

 Consolidated with 

 Nos. 97-1471, 97-1475, 97-1479, 97-1494, 97-1495, 

 97-1496, 97-1497, 97-1498, 97-1500, 97-1501, 97-1645

 On Petitions for Review of an Order of the 
 Federal Communications Commission

 Michael K. Kellogg argued the cause for Local Exchange 
Carrier petitioners. With him on the briefs were Mark L. 

Evans, William P. Barr, M. Edward Whelan, R. Michael 
Senkowski, Robert J. Butler, Daniel E. Troy, James R. 
Young, Michael E. Glover, Edward Shakin, James D. Ellis, 
Robert M. Lynch, Liam S. Coonan, Durward D. Dupre, 
Michael J. Zpevak, Thomas A. Pajda, Charles R. Morgan, 
William B. Barfield, M. Robert Sutherland, Robert B. 
McKenna, William T. Lake, John H. Harwood, II, Lawrence 
Sarjeant and Linda Kent. Henk J. Brands, Betsy L. 
Anderson and David W. Ogburn, Jr., entered appearances.

 Carl S. Nadler argued the cause for petitioners MCI 
Telecommunications Corporation and Ad Hoc Telecommuni-
cations Users Committee. With him on the briefs were 
Donald B. Verrilli, Jr., Anthony C. Epstein, Maria L. Wood-
bridge, James S. Blaszak and Kevin S. DiLallo.

 Laurence N. Bourne, Counsel, Federal Communications 
Commission, argued the cause for respondents. On the brief 
were Joel I. Klein, Assistant Attorney General, U.S. Depart-
ment of Justice, Catherine G. O'Sullivan and Robert J. 
Wiggers, Attorneys, Christopher J. Wright, General Counsel, 
Federal Communications Commission, John E. Ingle, Deputy 
Associate General Counsel, and Brian M. Hoffstadt, Special 
Counsel. Robert B. Nicholson, Attorney, U.S. Department of 
Justice, entered an appearance.

 Michael K. Kellogg argued the cause for Local Exchange 
Carrier intervenors. With him on the brief were Mark L. 
Evans, Michael S. Pabian, Donald M. Falk, James R. 
Young, Michael E. Glover, Edward Shakin, Charles R. Mor-
gan, William B. Barfield, M. Robert Sutherland, James D. 
Ellis, Robert M. Lynch, Liam S. Coonan, Durward D. 
Dupre, Michael J. Zpevak, Thomas J. Pajda, Robert B. 
McKenna, William T. Lake and John H. Harwood, II. Henk 
J. Brands, Betsy L. Anderson and David W. Ogburn, Jr., 
entered appearances.

 Gene C. Schaerr argued the cause for intervenor AT&T 
Corporation. With him on the brief were Jules M. Perlberg, 


Mark C. Rosenblum, and Peter H. Jacoby. Richard P. Bress 
entered an appearance.

 Douglas E. Hart was on the briefs for intervenor Indepen-
dent Telephone and Telecommunications Alliance on Behalf of 
Small and Mid-Size Carriers.

 Before: Edwards, Chief Judge, Williams and Randolph, 
Circuit Judges.

 Opinion for the Court filed by Circuit Judge Williams.

 Williams, Circuit Judge: Long-distance telephone traffic is 
ordinarily transmitted by a local exchange carrier ("LEC") 
from its origin to a long-distance carrier (or interexchange 
carrier or "IXC"). The IXC carries the traffic to its region of 
destination and hands it off to the LEC there. The IXC 
charges the customer for the call and pays "access charges" 
to the LECs at either end. In a 1997 rulemaking the Federal 
Communications Commission amended its methodology for 
limiting these charges, as applied to the largest IXCs. The 
rule is challenged on one side by a group of LECs, and on the 
other by one IXC, namely MCI, and an Ad Hoc Telecommu-
nications Users Committee (collectively referred to here as 
MCI).

 In regulating access charges the FCC currently uses a 
"price cap" method--mandatory for the largest LECs (the 
regional Bell operating companies and GTE) and optional for 
others. Under traditional rate-of-return regulation an agency 
sets rates calculated to allow the utility to recover its costs, 
including a reasonable rate of return on investment, with 
adjustment as needed to reflect cost changes; here, however, 
it sets rate ceilings and, with some qualifications, allows the 
utilities to keep whatever profits they can make while charg-
ing rates at or under the cap. (A LEC may also file rates 
above the caps, but for these the review process is cumber-
some and the substantive standards stringent.) The price 
cap system is intended (among other things) to improve the 
utility's incentives to cut costs and refrain from overinvest-
ment, incentives that are more blunted under the traditional 


method. See generally National Rural Telecom Ass'n v. 
FCC, 988 F.2d 174, 177-79 (D.C. Cir. 1993).

 The price caps were initially set at the levels of each 
carrier's rates on July 1, 1990. From the outset they have 
been subject to various annual adjustments, including reduc-
tion by a "productivity offset," or "X-Factor." See 47 CFR 
s 61.45. In the order under review, the agency revised the 
method for determining the X-Factor, eliminated a "sharing" 
mechanism that forced LECs to return some or all of the 
profits above specified levels to ratepayers, and required 
"reinitialization," i.e., a reduction in the price caps applicable 
after July 1, 1997 so that they would be calculated as if the 
new X-Factor had been in effect for the LECs' 1996 tariff 
filings. In the Matter of Price Cap Performance Review for 
Local Exchange Carriers, Fourth Report & Order, 12 FCC 
Rcd 16,642 (1997) ("1997 Order"). Because the access 
charges are in the aggregate so enormous, even small 
changes in the X-Factor have a large monetary value; the 
LECs claim (without dispute) that each 0.1% change in the 
factor represents a $23 million change in the industry-wide 
access charge.

 I. The historic productivity component of the X-Factor

 The X-Factor is aimed at capturing a portion of expected 
increases in carrier productivity, so that these improvements, 
as under competition, will result in lower prices for consum-
ers. In the Matter of Policy and Rules Concerning Rates for 
Dominant Carriers, 3 FCC Rcd 3195, 3394 (1988). Apart 
from a "consumer productivity dividend" ("CPD") described 
below, it is based on an assumption that historic productivity 
increases will be matched in the future. The agency resolved 
in the 1997 Order that the X-Factor (apart from the CPD) 
should be calculated as the sum of the difference in productiv-
ity growth and the difference in input price growth between 
the LECs and the economy as a whole. See 12 FCC Rcd at 
16,680, p 95. It can thus be expressed as follows: X = ( %
LEC TFP - % TFP) + ( % U.S. input prices - % LEC 
input prices), where TFP = total factor productivity. See 12 

FCC Rcd at 16,785.1 The formula may be more readily 
conceptualized as X = ( % LEC TFP - LEC input prices) - 
( % U.S. TFP - % U.S. input prices).
 Several parties submitted estimates of historical X-Fac-
tors. In a determination unchallenged here, the FCC accord-
ed the greatest weight to its own estimates, although it also 
gave "some weight" to AT&T's estimates (we discuss this 
decision below). See 1997 Order, 12 FCC Rcd at 16,695, p 37. 
The estimates the FCC considered, and the averages of those 
estimates over specified periods, are the following:
 Table 1
 Year FCC AT&T
 1986 -0.5% 0.2%
 1987 5.0 4.1
 1988 5.0 6.4
 1989 7.9 8.8
 1990 8.8 11.0
 1991 5.8 6.0
 
__________
 1 This equation is apparently derived as follows from the FCC's 
general rule that the X-Factor is to "provide a reliable measure of 
the extent to which changes in the LECs' unit costs have been less 
than the change in level of inflation," see 1997 Order, 12 FCC Rcd 
at 16,647, p 5: The general rule yields X = U - L, where U is the 
"change in level of inflation," and L is the change in the LECs' unit 
costs. The FCC then observes that "changes in a firm's unit costs 
come from two sources: (1) changes in productivity, and (2) changes 
in input prices," id. at n.16. Thus, L = % LEC input price - %
LEC productivity. Reading "change in level of inflation" as 
"change in unit costs in the economy as a whole," we get the similar 
expression: U = % U.S. input price - % U.S. productivity. 
Substituting these values into the equation X = U - L, using 
"TFP" for productivity, and performing a little algebraic manipu-
lation yields the equation in the text.
 As the Commission also increases the cap by general price 
inflation, see 12 FCC Rcd at 16,646, p 3, the net effect of these 
adjustments is (roughly, subject to effects of the use of different 
indices) to increase the cap by the LECs' estimated change in unit 
costs. It is somewhat as if the overall adjustment ("A") were (using 
the terms of the prior paragraph) A = U - X = U - (U - L) = L.

 1992 3.4 4.1
 1993 4.7 6.0
 1994 5.4 5.9
 1995 6.8 9.4
 Specified periods (averaged)
 1986-95 5.2 6.2
 1987-95 5.9 6.9
 1988-95 6.0 7.2
 1989-95 6.1 7.3
 1990-95 5.8 7.1
 1991-95 5.2 6.3
 Range of Averages: 5.2-6.1 6.2-7.3

1997 Order, 12 FCC Rcd at 16,696, p 137.

 The FCC consulted the moving averages to establish a 
range of reasonableness from 5.2% to 6.3% and then selected 
6.0% as the historical (i.e., non-CPD) component of the X-
Factor. See id. at 16,697, p 141. The LECs argue that the 
FCC did not give a rational explanation of that choice, and we 
agree. None of the reasons given for choosing 6.0% holds 
water.

 A.Devaluation of 1986-95 and 1991-95 averages

 First, in choosing a point within the range of reasonable-
ness, the FCC determined that it was "reasonable to place 
less weight" on two lowest averages, the ones for 1986-95 and 
1991-95. It said that the first, 1986-95, "is heavily influenced 
by the improbably low 1986 estimate of-0.5 percent." Id. at 
16,697, p 139. But the Commission gave no reason for con-
demning the 1986 estimate as "improbable," and mere diver-
gence from the other numbers does not justify such a conclu-
sion. See Thomas H. Wonnacott & Ronald J. Wonnacott, 
Introductory Statistics for Business and Economics 497 (2d 
ed. 1977). The FCC invokes our cases upholding the elimina-
tion of outlying data points, but in them the agency explained 
why the outliers were unreliable or their use inappropriate. 
See Bell Atlantic Tel. Cos. v. FCC, 79 F.3d 1195, 1202 (D.C. 
Cir. 1996) (study indicated outlier erroneous); Association of 
Oil Pipe Lines v. FERC, 83 F.3d 1424, 1434 (D.C. Cir. 1996) 

(skewed data distribution required outlier elimination to avoid 
windfall profits to many oil pipelines).

 As to the 1991-95 average, the Commission said it was the 
one "most affected by the low 1992 estimate," which it in turn 
diagnosed as "an artifact of a one-year jump in the measured 
productivity of the national economy as economic activity 
increased, rather than a change in the growth rate of LEC 
productivity or input prices." 1997 Order, 12 FCC Rcd at 
16,697, p 139. This is mystifying. If the productivity compo-
nent of the X-Factor is to reflect the difference between LEC 
and overall productivity growth, a proposition that is built 
into the Commission's formula, see 1997 Order, 12 FCC Rcd 
at 16,785, there seems no reason to slight a datum because its 
anomalous character stems from the unusual magnitude of 
the second term rather than of the first.

 B.Alleged upward trend

 In justification of its choice of 6.0% the FCC also cites an 
upward trend in the X-Factor during the last years it sur-
veyed. See 1997 Order, 12 FCC Rcd at 16,697, p 139 
("[F]rom 1993 onward there has been an upward trend in the 
X-Factor"); id. at p 141 ("[T]here appears to be a strong 
upward trend in productivity growth from 1992 to 1995").2 
The FCC's reliance on the upward trend necessarily reflects 
the (unexplained) assumption that the trend will continue, at 
least in the immediate future. Explanation might be reason-
ably omitted if there were no obvious reason to doubt contin-
uation of an observed trend. But two such reasons exist.

 First, the trend appears to be part of a cyclical pattern. 
Although the X-Factor did increase steadily in the 1992-95 
period, it also decreased from 1990 to 1992, after rising from 
1986 to 1990. See Table 1, supra. Perhaps there was reason 

__________
 2 The parties dispute whether the trend in question covers 
1992-95 or 1993-95, with the FCC calling the reference to 1992-95 
at p 141 a "typographical error," FCC Br. at 34, and the LECs 
arguing that any typographical error should have been corrected in 
FCC's errata, LEC Reply Br. at 10. The answer makes no 
difference to our analysis.

to believe that there would be no cyclical downturn during the 
expected life of this X-Factor determination, which was to be 
reviewed about two years after being made. See 1997 Order, 
12 FCC Rcd at 16,707, p 166. But the FCC offered no such 
reason.

 Second, the X-Factor is calculated as the sum of two 
components, neither of which followed a trend during the 
period in question. In fact, their year-to-year fluctuations 
swamped the trend increments:

 Table 2
 Year Difference between Difference between
 LEC & US changes in LEC and US changes
 total factor in input prices
 productivity
 1992 0.21 3.21
 1993 1.44 3.26
 1994 3.69 1.71
 1995 1.78 5.04

1997 Order, 12 FCC Rcd at 16,785. Where's the trend? As 
the underlying variables appear to be thrashing about wildly, 
the FCC's conclusion that the trend in the difference between 
the two had some predictive value requires explanation.

 C.Partial reliance on AT&T estimates

 Finally, the LECs argue that in its treatment of AT&T's 
X-Factor estimates the FCC "implicitly endorsed methodolo-
gies that it had earlier discredited." LEC Br. at 27. The 
FCC incorporated the aspects of AT&T's method that it 
deemed reasonable into its own method, see 1997 Order, 12 
FCC Rcd at 16,658, p 33, and then gave independent weight 
to AT&T's X-Factor estimates in deciding to extend the 
range of reasonableness upward, see 1997 Order, 12 FCC Rcd 
at 16,697, p 140, and to select a value near the top of the 
range. Id. at p 141. We agree that both these uses of 
AT&T's estimates appear irrational; any differences between 
the FCC's and AT&T's estimates presumably resulted from 
elements of AT&T's analysis that the FCC specifically reject-
ed. The FCC's argument that AT&T's estimates were "help-


ful" because AT&T's methodology was "similar," FCC Br. at 
37, fails to overcome that logic. If there is an explanation--
for example, conceivably the Commission gave some weight to 
AT&T's conclusions out of concern for the risk that it had 
erred in rejecting specific elements of AT&T's analysis--the 
FCC has failed to mention it.

 The Commission having failed to state a coherent theory 
supporting its choice of 6.0%, we remand for further explana-
tion.

 II. Consumer productivity dividend

 The second component of the X-Factor is a "consumer 
productivity dividend" ("CPD") of 0.5%. At the time of the 
1990 order instituting price-cap regulation, the FCC "expect-
ed ... that incentive regulation would result in greater 
productivity gains than rate of return regulation," Bell Atlan-
tic, 79 F.3d at 1198, and instituted the CPD, as it said, to 
"assure that the first benefits of price caps flow to customers 
in the form of reduced rates," In the Matter of Policy and 
Rules Concerning Rates for Dominant Carriers, 5 FCC Rcd 
6786, 6799, p 100 (1990) ("Price Cap Order"). It retained the 
0.5% CPD without specific explanation in a 1995 interim rule, 
Bell Atlantic, 79 F.3d at 1204, and retained it again in the 
current rule. See 1997 Order, 12 FCC Rcd at 16,690, p 123.

 The LECs challenge the 0.5% CPD as based on an "obso-
lete" justification. The Commission's earlier data on historic 
productivity improvement derived from the rate-of-return 
era, so an adjustment to reflect the expected incentive effects 
of price caps was in order; but the post-1990 data presum-
ably reflect those effects.

 FCC counsel responds that the agency believes that an 
innovation in the current rule--the Commission's elimination 
of the "sharing" of profits exceeding certain benchmarks--
will give the LECs still further productivity incentives, and 
that the FCC relied on that in retaining the CPD. Even if 
the agency relied on this justification (which the LECs dis-
pute), it never explained retention of the old percentage, a 
retention that required some comparison of the current 

change with the initial one in terms of their likely impacts on 
productivity. Thus we must remand for an explanation of the 
Commission's choice of the amount--0.5%.

 The LECs claim that the FCC did not rely on the expected 
effects of sharing elimination and that it gave no other reason 
justifying the retention of any CPD. We do not reach these 
arguments because the FCC will be able to give a clearer 
statement of its reasons in the remand on the amount and 
since the LECs do not dispute the argument FCC's counsel is 
presently making--that it is defensible to include a CPD 
corresponding to whatever productivity increase may be ex-
pected from the elimination of sharing.

 III. Elimination of sharing

 Before the rule at issue in this case, the FCC's price cap 
regime included a "sharing" mechanism, which mandated 
LEC rate reductions sufficient to return profits above speci-
fied levels to their customers, the IXCs. The most recent 
sharing regime, enacted in the 1995 interim order, made the 
sharing obligation dependent on the X-Factor, imposing no 
obligation of firms choosing a 5.3% X-Factor, and the follow-
ing on ones choosing 4.7% and 4.0%:

 Table 3
 Chosen X- 50% Give-back 100% Give-back
 Factor required for required for
 rate-of-return rate-of-return
 over over

 4.7% 13.25% 17.25%
 4.0% 12.25% 16.25%
In the Matter of Price Cap Performance Review for Local 
Exchange Carriers, 10 FCC Rcd 8961, 9058, p 222 ("Perfor-
mance Review Order") (1995). Attacking the Commission's 
elimination of the "sharing" mechanism, MCI first claims that 
the statutory mandate of "just and reasonable" rates, 47 
U.S.C. s 201(b), requires the FCC to impose a mechanism to 
prevent "unreasonable" returns. In the absence of any indi-
cation that Congress directly addressed the issue, we defer to 
the FCC's interpretation of the Communications Act unless it 

is unreasonable. See Chevron U.S.A. Inc. v. NRDC, 467 U.S. 
837 (1984). MCI cites no authority rejecting an FCC inter-
pretation of the statute contrary to the one MCI advances, 
and in Time Warner Entertainment Co. v. FCC, 56 F.3d 151 
(D.C. Cir. 1995), we endorsed a pure price cap regime with no 
sharing provision in the face of a statutory mandate to ensure 
"reasonable" basic cable rates. See id. at 162, 164-74.

 Next, MCI argues that elimination of sharing was arbitrary 
and capricious. But the agency advanced two sound ratio-
nales for its decision. First, it found that "sharing severely 
blunts the efficiency incentives of price cap regulation by 
reducing the rewards of LEC efforts and decisions." 1997 
Order, 12 FCC Rcd at 16,700, p 148. When all profits are 
taken away, a firm has no incentive to make them; when 
some proportion is taken away, firms will avoid at least some 
otherwise desirable choices with a prospect of enhancing 
profit but a risk of loss. Second, the FCC found that 
eliminating sharing would remove the incentive to shift costs 
to services that are subject to sharing and away from services 
that are not, thus cross-subsidizing the latter. 1997 Order, 12 
FCC Rcd at 16,700, p 148; id. at 16,701, p 151. MCI does not 
contest these effects, nor does it question the Commission's 
argument that monitoring to catch them would be administra-
tively burdensome and would increase its reliance on obsolete 
embedded accounting costs. Id. at 16,701-02, pp 151-52.

 Finally, MCI contends that it was arbitrary and capricious 
for the FCC to scuttle sharing but at the same time retain its 
"low-end adjustment," which gives the LECs some pricing 
leeway to prevent their returns from falling below a given 
level. There is clearly a literal asymmetry in protecting 
LECs in lean conditions while not constraining them in 
unexpectedly fat ones. But the FCC gave a good reason for 
creating this asymmetry--the Constitution's takings clause, 
which forbids the imposition of confiscatory rates without just 
compensation. See 1997 Order, 12 FCC Rcd at 16,704, p 157; 
Duquesne Light Co. v. Barasch, 488 U.S. 299, 307-08 (1989). 
The Commission thus avoided raising a non-trivial constitu-
tional question, one that has no analogy at the upper end of 


the range of allowable rates. See Time Warner, 56 F.3d at 
170.

 IV. Interstate v. total-company productivity

 MCI argues that in calculating the X-Factor the FCC 
arbitrarily used the LECs' productivity in all their telecom-
munications business rather than productivity only in their 
interstate operations. Again, we disagree. The FCC reason-
ably concluded that "the record before us does not allow us to 
quantify the extent, if any, to which interstate productivity 
growth may differ significantly from total company productiv-
ity growth," 1997 Order, 12 FCC Rcd at 16,686, p 110, and 
this determination was enough to justify using the total 
company data.

 In the first place, it is not clear that "interstate productivi-
ty," as opposed to total company productivity, is measurable, 
or even economically well-defined. This is so because direct 
productivity measurement requires measurement of inputs, 
and there is no obviously meaningful way to segregate LEC 
interstate and intrastate inputs because, as is undisputed, 
"interstate and intrastate services are usually provided over 
common facilities." 1997 Order, 12 FCC Rcd at 16,685, p 107. 
The Commission had previously recognized this analytical 
difficulty, questioning "whether it would be possible to devel-
op separate production functions for interstate and intrastate 
services," id., and it never unambiguously declared the issue 
resolved.

 The Commission nonetheless declared itself ready to con-
sider some adjustment if it were shown that inclusion of 
intrastate data systematically biased the X-Factor estimate 
downward. 1997 Order, 12 FCC Rcd at 16,686, p 109. AT&T 
offered claims of faster interstate productivity growth. It 
based these on an assumption of equal growth rates for 
interstate and intrastate inputs, but it offered no explanation 
why that assumption was economically justified, much less 
one so compelling that it would be error for the FCC to reject 
it. See AT&T Comments, CC Docket No. 94-1, App. A at 
23-30, 72-78; 1997 Order, 12 FCC Rcd at 16,686-87, p 110.

 MCI argues that in the original 1990 LEC price cap order 
the Commission inferred faster productivity growth in inter-
state services from the undisputed fact of faster output 
increase in that sector. See Price Cap Order, 5 FCC Rcd at 
6798, p 92 ("[T]he more rapid growth in interstate usage 
results in higher apparent interstate productivity growth."). 
This assumption should have continued, it says. But the 1990 
method of measuring productivity had not depended on the 
measurement of inputs at all; the Commission had simply 
inferred productivity growth from prior trends in rate reduc-
tions. 1997 Order, 12 FCC Rcd at 16,648, p 8. Given the 
shift to direct focus on input changes (a move that no one 
questions) and the uncertainty over interstate input trends, 
we do not see why the agency should have been bound to 
retain the assumption of faster interstate productivity growth. 
On this record, therefore, we do not find it unreasonable for 
the agency to have relied on total company productivity 
despite its theoretical shortcomings.

 V. Reinitialization

 "Reinitialization" is the name for the Commission's setting 
a current price cap at what it would have been if past X-
Factors had been different. For instance, if the price cap 
starts at 100 and the X-Factor is 1% for the first three years, 
the cap would stand at approximately 97 at the end of those 
years. 100 - (3 x 1) = 97. (The figure is only approximate 
because of compounding.) If the regulator then changes the 
X-Factor to 2% and imposes full reinitialization, it would 
revise the cap to about 94 for the year immediately following. 
100 - (3 x 2) = 94. In the 1997 Order, the FCC ordered 
reinitialization for one year, 1996. See 12 FCC Rcd at 16,714, 
p 179. Under our simple example, then, the cap would fall to 
approximately 96. 100 - (2 x 1) [two years' reduction of 
1%] - (1 x 2) [one year's reduction of 2%] = 96.

 Both the LECs and MCI challenge this decision, seeking to 
have it modified to favor their respective interests.

 A.Reinitialization based on CPD

 The LECs challenge the FCC's requirement that they 
include the CPD in the X-Factor used for reinitialization. In 

Part II, we explained the need to remand the case for further 
explanation of size of the CPD. We agree with the LECs 
that if the FCC retains the CPD because of the productivity 
benefits expected from the elimination of sharing, no element 
of reinitialization based on the CPD will be appropriate in the 
absence of evidence linking productivity gains to the anticipa-
tion of sharing's elimination; the companies could not have 
responded to that incentive before its creation.

 B.Disparate impact of uniform reinitialization

 The LECs argue that reinitialization fell more harshly on 
carriers that chose low X-Factors with high sharing obli-
gations for 1996 than on ones that chose high X-Factors. As 
a result of reinitialization, the low X-Factor carriers lost 
some of the future benefits of that choice, but were not in a 
position to recover any of sharing costs that they may have 
borne because of it. Reinitialization imposed no such asym-
metry on companies that had elected a high X-Factor. The 
LECs' specific complaint is that this was "an important 
aspect of the problem" before the Commission, which it was 
obliged to discuss. See Motor Vehicle Mfrs. Ass'n v. State 
Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

 The Commission argues that it failed to discuss the dispari-
ty because the LECs never brought the subject up. It cites 
s 405 of the Communications Act, 47 U.S.C. s 405, which 
bars review of an issue on "which the Commission ... has 
been afforded no opportunity to pass," see also United States 
v. FCC, 707 F.2d 610, 619 (D.C. Cir. 1983), unless the 
petitioners sought rehearing before the Commission--which 
the LECs did not. The LECs in turn say they couldn't have 
afforded the Commission a chance to pass on it; the Commis-
sion had never given notice of any intent to order reinitializa-
tion.

 Section 405's "no opportunity to pass" clause does not in 
terms exclude instances where the lack of opportunity is due 
to some fault of the Commission--such as its springing a 
novelty at the last minute. But we need not sort that out 
here, because we find no fault in the Commission's procedure. 
Reinitialization may not have been a subject on which the 


Commission explicitly elicited comment in its notices for this 
rulemaking, but the prospect surely brooded over the pro-
ceeding. In its 1995 mid-course correction of the price caps it 
had ordered reinitialization--in a form, in fact, that fell only 
on those LECs that had chosen a low X-Factor in exchange 
for greater risk of sharing, and not at all on those that had 
chosen a high one. Performance Review Order, 10 FCC Rcd 
at 9069-73, pp 245-54. If the perceived asymmetry was as 
serious as the LECs now make out, we should have expected 
them to alert the Commission in this proceeding in advance: 
"If you do a reinitialization, at least avoid the dreadful 
asymmetry of the 1995 order." No such alert was sounded.

 C.Reinitialization for only one year

 MCI claims that the FCC should have reinitialized the X-
Factor all the way back to 1991 (the first year of the price-cap 
regime). It says the agency has a policy of correcting errors 
in X-Factor determinations and that it decided in the current 
rule that prior determinations were in error. In the alterna-
tive, MCI argues that the FCC should reinitialize back to 
1995, the year in which the previous X-Factor was adopted.

 In the 1995 interim price cap review, the FCC determined 
that a single year's productivity estimate generated by its 
former method was understated, based in large part on the 
estimate's discrepancy with the results of a TFP study. See 
Performance Review Order, 10 FCC Rcd at 9053, p 208. It 
then calculated a new X-Factor designed to eliminate the 
effects of the understatement and required LECs to set their 
price caps as though the new X-Factor had been in effect 
since the advent of price cap regulation. See id. at 9069, 
p 245. In 1997 the Commission determined that its former 
method had systematically understated productivity relative 
to the TFP method, but required reinitialization for one year 
only. See 1997 Order, 12 FCC Rcd at 16,713-14, pp 178-79.

 The situations are somewhat similar, but the FCC ade-
quately distinguished them. It rested its 1997 decision to 
limit reinitialization on the need to "limit harm to LEC 
productivity incentives that could result from the perception 
that our regulatory policies unnecessarily lack constancy." 

1997 Order, 12 FCC Rcd at 16,714, p 179. It seems clear that 
a second extensive reinitialization would considerably aggra-
vate such a perception. Universal, complete reinitialization 
would impair the supposed incentive advantages of price 
caps--which derive from firms' supposing that their efficien-
cies will not come back to haunt them.

 VI. The rule's effects on small and mid-size LECs

 The Independent Telephone and Telecommunications Alli-
ance, an intervenor, argues that the FCC acted arbitrarily 
and capriciously in establishing a uniform X-Factor for all 
LECs, regardless of size and economic characteristics, and in 
failing to consider the disparate impact of its reinitialization 
requirement on small and mid-size LECs. Because the peti-
tioners here have not raised these issues, ITTA is procedural-
ly barred from arguing them. See Illinois Bell Tel. Co. v. 
FCC, 911 F.2d 776, 785-86 (D.C. Cir. 1990).

 It is true, as ITTA points out, that this court in Synovus 
Fin. Corp. v. Board of Governors, 952 F.2d 426, 434 (D.C. Cir. 
1991), characterized the rule against consideration of issues 
raised by intervenors and not by petitioners as "a prudential 
restraint rather than a jurisdictional bar." But in deciding to 
consider the intervenor's issue there, the court relied on the 
fact that the relevant issue was "an essential predicate" to an 
issue raised by a petitioner. Id. That circumstance is cer-
tainly not present here. The Synovus court offered a second 
reason to hear the claim--that the intervenor was not "the 
losing party in the administrative proceeding," and thus did 
not have "every incentive to petition for review." Id. Here, 
ITTA itself claims that it "through its members, participated 
fully in the proceedings below," ITTA Reply Br. at 3, and that 
its "members raised the issue of the necessity of multiple X-
Factors," the very issue it seeks to raise in this court.

 Thus, neither of the special circumstances cited in Synovus 
is present. Furthermore, ITTA presents no reason why it 
could not have petitioned in its own right. We decline to 
consider its arguments.


 Conclusion

 The FCC's decisions to select 6.0% as the first component 
of the X-Factor and to retain the 0.5% CPD are reversed and 
remanded to the agency for further explanation; the FCC 
may of course request a stay of this order pending its 
reconsideration. The petitions for review are otherwise de-
nied.

 So ordered.