# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 21, 2005        Decided June 20, 2006

No. 04-1331

VERIZON TELEPHONE COMPANIES, ET AL.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

AT&T CORPORATION,
INTERVENOR

Consolidated with
04-1332

On Petitions for Review of an Order of the
Federal Communications Commission

*Sean A. Lev* argued the cause for petitioners. With him on the briefs were *Michael K. Kellogg, Mark L. Evans, Scott H. Angstreich, Michael E. Glover, Edward Shakin, James G. Harralson*, and *Bennett L. Ross. Richard M. Sbaratta* entered an appearance.

*Richard K. Welch*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *R. Hewitt Pate, III*, Assistant Attorney General, U.S. Department of Justice, *Robert J. Wiggers* and *Robert B. Nicholson*, Attorneys, and *John E. Ingle*, Deputy Associate General Counsel, and *Laurel R. Bergold*, Counsel. *John A. Rogovin* and *Samuel L. Feder*, Counsel, entered appearances.

*Judy Sello*, *David W. Carpenter*, and *David L. Lawson* were on the brief for intervenor AT&T Corporation. *James P. Young* entered an appearance.

Before: GINSBURG, *Chief Judge*, and ROGERS and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: This matter involves the use of an accounting rule, "add-back," in a complex area of regulation addressing the rates charged by local telephone exchange carriers for access to their networks. Its resolution, however, is relatively straightforward because, at its core, petitioners' challenge cannot overcome the broad delegation of power Congress has given the Federal Communications Commission ("FCC" or "Commission") to suspend petitioners' rates and determine whether they are "just and reasonable." Petitioners contend that the FCC unreasonably required their 1993 and 1994 tariffs to comply with the add-back rule years after those tariffs were filed. But Congress has expressly authorized the FCC to do what petitioners urge it cannot: suspend petitioners' tariffs upon their filing, subject petitioners to an accounting order to track revenue earned under the tariffs, and determine at a later date whether petitioners' tariffs contain "just and reasonable" rates. 47 U.S.C. § 204(a)(1). We conclude that the Commission reasonably applied its "quasi-legislative authority," *see Global*

*NAPs, Inc. v. FCC*, 247 F.3d 252, 259 (D.C. Cir. 2001), under 47 U.S.C. § 204(a)(1) in rejecting petitioners' suspended tariffs for failing to apply add-back.

## I.

Significant background is needed to understand the issue before us. Prior to September 1990, local telephone companies (local exchange carriers or "LECs") were subject to "rate-of-return" regulation in setting prices for interstate carriers to access their local telephone networks. *1993 Annual Access Tariff Filings; 1994 Annual Access Tariff Filings*, 19 F.C.C.R. 14,949, 14,949 ¶ 2 (2004) (the "*Tariff Order*"). As we explained in *National Rural Telecom Ass'n v. FCC*, 988 F.2d 174 (D.C. Cir. 1993),

> [r]ate-of-return regulation is based directly on cost. Firms so regulated can charge rates no higher than necessary to obtain sufficient revenue to cover their costs and achieve a fair return on equity. As one virtue of perfect competition is that it drives prices down to cost, rate-of-return regulation seems on its face a promising way to regulate natural monopolies, in principle roughly duplicating the benefits of competition.

*Id.* at 177-78 (quotation marks and internal citations omitted). Under rate-of-return regulation, if an LEC earned more than was permitted by the regulated rate, the company was required to refund those over-earnings to its ratepayers. *Price Cap Regulation of Local Exch. Carriers*, 8 F.C.C.R. 4415, 4415 ¶ 5 (proposed July 6, 1993) ("*Add-Back NPRM*"). The Commission "required LECs to treat refund payments as adjustments to the period in which the overearnings occurred, rather than to the period in which the refund is paid." *Id.* "Thus, LECs 'added-

back' the amount of any refund for prior excess earnings into the total earnings used to compute the rate of return for the current earnings period." *Tariff Order*, 19 F.C.C.R. at 14,950 ¶ 2. The reason for requiring add-back was simple: for rate-of-return regulation to work, a current earnings period needed to reflect current earnings and not be distorted by refunds paid in the current period for past overcharges. Add-back "provide[d] a clear picture of current earnings for the reporting period" by allowing the Commission to determine "whether an access category being adjusted through a refund is earning above its adjusted maximum rate of return in the monitoring period." *Amendment of Part 65, Interstate Rate of Return Prescription*, 1 F.C.C.R. 952, 956 ¶ 43 (1986).

"In September 1990, the Commission replaced rate-of-return regulation for the largest LECs with . . . price cap regulation." *Tariff Order*, 19 F.C.C.R. at 14,950 ¶ 3. Under the price cap regime, "the regulator sets a maximum price, and the firm selects rates at or below the cap. Because cost savings do not trigger reductions in the cap, the firm has a powerful profit incentive to reduce costs." *Nat'l Rural Telecom*, 988 F.2d at 178. "Price cap regulation is intended to provide better incentives to the carriers than rate of return regulation, because the carriers have an opportunity to earn greater profits if they succeed in reducing costs and becoming more efficient." *Bell Atl. Tel. Cos. v. FCC*, 79 F.3d 1195, 1198 (D.C. Cir. 1996). The Commission had to address three basic questions in setting up price cap regulation: (1) what initial price caps should be; (2) how to address inflation in future years; and (3) how to account for the LECs' future efficiency and innovation. The Commission answered the first question by "cho[osing] existing rates," the second question by selecting "an escalator based on general price inflation," and the third by providing for "an annual percentage reduction [to the price caps] for expected savings from innovation and other economies." *Nat'l Rural*

*Telecom*, 988 F.2d at 178 (citing *Policy and Rules Concerning Rates for Dominant Carriers, Second Report and Order*, 5 F.C.C.R. 6786, 6792, 6814 (1990) ("*LEC Price Cap Order*")). At issue here is this third determination: the percentage reduction applied to price cap indices ("PCIs") annually, known as a productivity factor or "X-factor."

The Commission sought to create a productivity factor that would "generate lower rates for customers while offering LECs a fair opportunity to earn higher profits." *LEC Price Cap Order*, 5 F.C.C.R. at 6801 ¶ 120. But the Commission believed that it would be "difficult to determine a single, industry-wide productivity offset that will be perfectly accurate for the industry as a whole or for individual LECs or market conditions at a given time." *Id.* Accordingly, the Commission adopted two mechanisms to prevent an imperfect productivity factor (*i.e.*, one that does not accurately represent efficiency gains or losses) from distorting customer rates or the LECs' profits. Under its "sharing plan" mechanism, the Commission required participating LECs to "share" their earnings above a certain level with their interstate access customers by lowering their price caps in the following year. *LEC Price Cap Order*, 5 F.C.C.R. at 6801 ¶ 124. Price cap LECs were allowed to choose one of two X-factors, which would dictate how much their rates would be lowered and the extent of their sharing obligation. Specifically,

> a price cap LEC opting for an X-factor of 3.3 percent and earning a rate of return above 12.25 percent was required to share half of earnings above 12.25 percent and all earnings above 16.25 percent with its access customers. [*LEC Price Cap Order*, 5 F.C.C.R. at 6801 ¶ 125.] For LECs that elected a more challenging 4.3 percent X-factor, 50 percent sharing began for rates of return above 13.25 percent, and 100 percent sharing

began at rates of return above 17.25 percent. [*LEC Price Cap Order*, 5 F.C.C.R. at 6787-88 ¶¶ 7-10.]

*Tariff Order*, 19 F.C.C.R. at 14,951 n.9.[1] Thus, an LEC that selected a 4.3 percent X-factor would initially have to cut rates more than a competitor that selected a 3.3 percent X-factor, but could keep a greater percentage of its earnings. Alternatively, a "low-end adjustment" mechanism "permitted price cap LECs earning less than 10.25 percent in a particular year to adjust their PCIs and rates upward in the following year to a level that would have allowed them to achieve an earnings rate of at least 10.25 percent for the year in which they under-earned." *Id.* at 14,951 ¶¶ 3, 4.

Sharing and low-end adjustments were first applied to the LECs' 1992 access tariffs. Some LECs had to lower their price caps based upon 1991 earnings, while others were permitted to increase price caps for 1992. One year later, those adjustments raised an issue not addressed by the Commission in promulgating its price cap plan: what effect should the adjustments made to 1992 price caps based upon over- or under-earnings from 1991 have in calculating the rates of return for 1992 (and thereby determining the rates to be charged for 1993)? In calculating the rates to be charged for 1993, LECs

---

[1] Rate-of-return regulation used a rate-of-return calculation to set "a maximum allowable return" based upon LECs' costs and a prescribed rate of return. *Tariff Order*, 19 F.C.C.R. at 1949-50 ¶ 2; *see Nat'l Rural Telecom*, 988 F.2d at 177-78. Even under the price cap regime at issue here, however, a rate-of-return calculation is necessary to determine, among other things, an LEC's sharing or low-end adjustment. *See Bell Atl.*, 79 F.3d at 1199 ("Sharing entails a one-time adjustment to a local exchange carrier's price cap index when its rate of return for the previous year has been abnormally high."); *id.* at 1199 n.4 (explaining that low-end adjustments were calculated using a "mechanism [that] mirrors the sharing adjustment").

had to determine whether (1) to "add back" the adjustment made to rates for 1992 in calculating the rate of return for 1992, as occurred prior to price cap regulation or (2) to calculate the rate of return for 1992 without considering the effect of sharing or low-end adjustments made because of earnings from 1991. Perhaps not surprisingly, LECs that could achieve higher rates for 1993 by applying add-back chose to apply add-back, and LECs that could achieve higher rates for 1993 by not applying add-back chose not to apply add-back. Thus, each LEC took the position on add-back that would allow it to maximize its price caps for 1993. *See id.* at 14,951 ¶ 4.

This selective use of an accounting rule by the LECs did not go unnoticed by the Commission. The Commission initiated a rulemaking regarding add-back, proposing that its price cap regime include a specific rule mandating add-back. *See Add-Back NPRM,* 8 F.C.C.R. at 4417 ¶ 15. Soon thereafter, noting that the add-back issue was unresolved and pending in the rulemaking proceeding, the Commission suspended 1993 tariffs for one day, issued an accounting order, and set for investigation all 1993 access tariffs for carriers that benefitted from a low-end adjustment or were subject to sharing for 1992. When price cap LECs filed 1994 tariffs, the Commission suspended those rates as well, issued an accounting order, and broadened the scope of the 1993 investigation to include 1994 tariffs.

A.  *The Add-Back Rulemaking.*

In the *Add-Back NPRM*, the Commission indicated that no "commenters in the LEC Price Cap rulemaking or in the subsequent reconsideration proceeding discussed the details of rate of return calculations, or requested that [it] eliminate add-back from the rate of return calculations of the LEC price cap plan." *Id.* at 4416 ¶ 10. The Commission, "[h]owever, . . . recognize[d] that this issue was neither expressly discussed in

the LEC price cap orders nor clearly addressed in [its] Rules." *Id.* at 4415 ¶ 4. The Commission "believe[d] that [add-back] continue[d] to be an appropriate and indeed probably necessary component of the [price-cap] backstop." *Id.* at 4416 ¶ 11. Because "[t]he amounts of sharing or lower formula adjustment implemented in one year . . . relate to productivity performance in a prior year[,] . . . unless add-back occurs, the relationship between rate of return and productivity growth becomes hidden." *Id.* Furthermore, an "unadjusted rate of return effectively double-counts the amount of the backstop adjustment, once in the base year and then again in the tariff year." *Id.* at 4416 ¶ 12. Finally, without add-back, the Commission believed that "the effective rate of return [for LECs] over time could fall outside the range of returns [it] judged to be reasonable." *Id.* at 4416 ¶ 13.

After receiving and addressing comments, the Commission adopted a new regulation that explicitly required add-back under its price cap rules. *See Price Cap Regulation of Local Exch. Carriers*, 10 F.C.C.R. 5656, 5657, 5659 ¶¶ 4, 16 (1995) (the "*Add-Back Rulemaking Order*"). The *Add-Back Rulemaking Order* noted that the Commission's price cap rules had not "specif[ied] the manner in which these [sharing and low-end] adjustments should be treated by the LECs in computing their interstate earnings for the year in which the sharing or low-end adjustment is effected," *id.* at 5656 ¶ 1, and indicated that "in adopting the *LEC Price Cap Order*, the Commission did not state that it intended to eliminate the requirement under rate-of-return regulation that carriers subtract revenues reflecting out-of-period earnings for purposes of calculating current year earnings," *id.* at 5661 ¶ 32. According to the Commission, the issue of how to treat these adjustments did not arise until 1993, the first year that price caps would be based upon prices that were previously subjected to adjustments. *See id.* at 5658 ¶ 10. Absent explicit guidance on add-back from the

Commission in the price cap context, the Commission noted again that LECs had taken divergent approaches on whether to apply this accounting rule. *See id.* at 5658 ¶ 11. After a lengthy analysis, the Commission concluded that adding back a sharing adjustment "ensures that the earnings thresholds applied to determine price cap LECs' sharing obligations are those [the Commission] intended when [it] adopted" the price cap plan, *id.* at 5660 ¶ 22, and that adding back any low-end adjustment was also necessary for essentially the same reason, *see id.* at 5661 ¶ 28.

Several parties petitioned for review of the *Add-Back Rulemaking Order* in this Court, arguing that "the add-back requirement is arbitrary and capricious because it requires carriers to recognize 'phantom' earnings and because it requires carriers to share more than the original price cap rules intended." *Bell Atl.,* 79 F.3d at 1205. We rejected those arguments and held that the Commission reasonably applied add-back, noting that add-back "provides useful information about the carrier's productivity because it reflects what the carrier could have earned but for the sharing obligation." *Id.* at 1206. The Commission also reasonably determined that add-back "resulted in the right level of sharing, and . . . was a necessary part of the sharing mechanism." *Id.* We also rejected petitioners' argument that adopting an add-back rule would result in retroactive rulemaking. We noted that (1) "[t]he sharing rules do not regulate past transactions; they regulate future rates;" and (2) "the add-back rule does not change the past legal consequences of carriers' decisions to choose the 3.3 percent X-factor rather than the 4.3 percent X-factor" because "[t]he state of the law has never been clear, and the issue has been disputed since it first arose in 1993," meaning that the "rule does not upset . . . reasonable reliance interests." *Id.* at 1207.

B.  *The 1993 and 1994 Tariff Suspension Proceedings.*

Five days after initiating notice and comment proceedings, the Commission entered its order suspending and opening an investigation of 1993 tariffs for LECs that benefitted from a low-end adjustment or were subject to sharing in 1992, *1993 Annual Access Tariff Filings*, 8 F.C.C.R. 4960, 4965 ¶ 32 (Common Carrier Bureau 1993), and, as noted, took the same approach to 1994 tariffs, *1994 Annual Access Tariff Filings*, 9 F.C.C.R. 3705, 3713 ¶ 12 (Common Carrier Bureau 1994).  For both matters (the "1993 and 1994 investigations"), the Commission entered an "accounting order," so that the LECs' access charges for 1993 and 1994 could be tracked and refunds could be ordered if those tariffs were found to be unlawful.

Both suspension orders noted the Commission's pending rulemaking on the add-back issue, but did not specify any timetable for when the 1993 and 1994 investigations would be completed.  Even after the *Add-Back Rulemaking Order* was released in 1995, and after this Court in *Bell Atlantic* rejected in 1996 the challenges of various LECs to the *Add-Back Rulemaking Order*, the Commission was silent about the 1993 and 1994 investigations.  Finally, in 2003, the Commission issued an order seeking comments "to refresh a record that, due to passage of time and several mergers and acquisitions among the interested parties, may have now grown stale." *Further Comment Requested on the Appropriate Treatment of Sharing and Low-End Adjustments*, 18 F.C.C.R. 6483, 6487 (2003).  On July 30, 2004, pursuant to its authority under 47 U.S.C. § 204(a)(1) to determine whether a regulated tariff contained "just and reasonable" rates, *see* 47 U.S.C. § 201(b), the Commission released an order determining that 1993 tariffs of LECs which were subject to a sharing or low-end adjustment in 1992 were just and reasonable if they applied add-back, and that 1993 tariffs of LECs which were subject to a sharing or low-end

adjustment in 1992 were not just and reasonable if they had not applied add-back. *Tariff Order*, 19 F.C.C.R. at 14,949 ¶ 1. The Commission reached the same determination with respect to 1994 tariffs. *Id.* The Commission left open the question of refunds for any overcharges that resulted from the imposition of unjust and unreasonable rates, concluding that it would hold further proceedings on the scope of any refunds. *See id.* at 14,961-62 ¶ 29 ("After reviewing the recalculations and refund plans submitted in response to this order, and replies received on these recalculations and refund plans, we will, as appropriate, approve, disapprove, or order modification of the filed recalculations and refund plans."). Two LECs that participated in the proceedings that led to the *Tariff Order*, Verizon Communications Inc. (and its various subsidiaries) ("Verizon") and BellSouth Corporation ("BellSouth"), filed these timely petitions for review of the *Tariff Order*.

## II.

Even where the "parties assure us that we have jurisdiction over [a] case, we have an independent obligation to be certain." *Midwest Indep. Transmission Sys. Operator, Inc. v. FERC*, 388 F.3d 903, 908 (D.C. Cir. 2004) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998)). Petitioners assert that we have jurisdiction to review their challenge to the *Tariff Order* pursuant to 47 U.S.C. § 402(a) and 28 U.S.C. §§ 2342(1), 2344, which the Government does not dispute. "[Section] 402(a) provides that review shall be sought through the general petition process prescribed in 28 U.S.C. §§ 2341-2351." *N. Am. Catholic Educ. Programming Found., Inc. v. FCC*, 437 F.3d 1206, 1208 (D.C. Cir. 2006). "Section 2342 of the Judicial Review Act confers on the court of appeals 'exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all *final* orders of the Federal Communications Commission made reviewable by section

402(a) of title 47.'" *Am. Ass'n of Paging Carriers v. FCC*, 442 F.3d 751, 755 (D.C. Cir. 2006) (quoting 28 U.S.C. § 2342) (emphasis added).

As "§ 402(a) applies only to *final* orders," *N. Am. Catholic*, 437 F.3d at 1209 (emphasis in original), some discussion is needed regarding our jurisdiction to review the *Tariff Order* when that order contemplates further proceedings regarding refunds that petitioners may or may not have to provide—*i.e.*, when that order does not appear to be "final." "[U]nder a well-established principle of finality, when a tribunal elects to resolve the issue of liability in a particular action while reserving its determination of damages on that liability, that decision generally is not considered 'final' for purposes of judicial review." *Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1104 (D.C. Cir. 2001). "This basic understanding of finality is the norm not only in civil litigation, but also in the administrative context, at least where the relevant statute does not embrace a non-traditional view of finality." *Id.* Although the *Tariff Order* determined that petitioners' 1993 and 1994 tariffs were unlawful, the Commission made clear that proceedings would continue regarding what refunds would occur, *i.e.*, what liability petitioners would have.

As we recognized in *Verizon*, however, this norm of finality may be "supplanted by statute." *Id.* at 1104-05 (holding, despite the pendency of future proceedings to determine damages, the Commission's determination that LECs had imposed unreasonable charges was final action subject to review per 47 U.S.C. § 208(b)). The same is true here: the *Tariff Order* completed the Commission's "hearing and decision" regarding "the lawfulness" of the LEC's tariffs, *id.* § 204(a)(1), making it a "final order" over which we may exercise jurisdiction under § 204(a)(2)(C) ("Any order concluding a hearing under this section shall be a final order and may be appealed under section

402(a) of this title.").  Thus, we have jurisdiction to review the LECs' challenge to the Commission's lawfulness conclusion in the *Tariff Order*.

## III.

Section 201(b) of the Communications Act (the "Act"), 47 U.S.C. § 201(b), provides that charges for interstate or foreign communications "shall be just and reasonable." *See Bell Atl.*, 79 F.3d at 1202.  Section 204(a)(1) of the Act, 47 U.S.C. § 204(a)(1), directs that "[w]henever there is filed with the Commission any new or revised charge," the Commission may investigate "the lawfulness" of the charge and immediately "suspend the operation of such charge" for a "period [of up to] five months beyond the time when [the charge] would otherwise go into effect."  If the Commission's hearing has "not been concluded," the Act allows the "the proposed new or revised charge . . . [to] go into effect" after five months, but the Commission may require a carrier to "keep accurate account of all amounts received" under the potentially unlawful charge (*i.e.*, order an accounting). *Id.*  In determining whether a new or revised charge is lawful under § 204(a)(1), the Act provides that "the burden of proof . . . shall be upon the carrier." *Id.*

Section 201(b) also authorizes the Commission to "prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter."  The Commission did just that in 1995 when promulgating its add-back rule through the *Add-Back Rulemaking Order*.  Concerned that "[w]ithout add-back, the double-counting of backstop adjustments could effectively permit earnings outside the range of reasonableness we designated," *Add-Back NPRM*, 8 F.C.C.R. at 4416 ¶ 13, the Commission concluded "that the add-back adjustment is a necessary element of the sharing and low-end adjustment mechanisms." *Add-Back Rulemaking Order*, 10

F.C.C.R. at 5659 ¶ 16. The Commission expressly relied upon, *inter alia*, its authority under §§ 201 and 204 in promulgating its add-back rule. *Id.* at 5666 ¶ 58. After it did so in 1995, carriers knew with certainty that rates in future tariffs would have to be calculated with add-back in order to be considered just and reasonable under both statutes.

With respect to petitioners' suspended 1993 and 1994 tariffs, the Commission acted pursuant to those very same statutes in attempting to determine "whether just and reasonable rates can be achieved pursuant to the requirements of section 201 of the Act and the *LEC Price Cap Order* if add-back is not required." *Tariff Order*, 19 F.C.C.R. at 14,954 ¶ 9 & n.42 (citing 47 U.S.C. §§ 201, 204). Thus, the Commission applied the same statutes and "just and reasonable" statutory standard that it applied in promulgating its add-back regulation. Petitioners recognize, as they must, that this Court in *Bell Atlantic* resolved a myriad of challenges to the reasonableness of the add-back concept:

> Petitioners . . . claim that the add-back requirement is arbitrary and capricious because it requires carriers to recognize "phantom" earnings and because it requires carriers to share more than the original price cap rules intended. Neither of these objections strikes us as persuasive.

> * * *

> The Commission uses earnings as a proxy for measuring a carrier's productivity; the add-back rule maintains the link between productivity and earnings. That the carrier did not actually earn the add-back amount is beside the point. The add-back amount provides useful information about the carrier's

productivity because it reflects what the carrier could have earned but for the sharing obligation.

* * *

The Commission recognized that the carrier would have to continue sharing year after year, but thought this made sense. As the Commission saw it, the add-back rule does not create a ripple effect. It erases the ripple effect of the sharing mechanism. . . . The Commission found that add-back resulted in the right level of sharing, and that it was a necessary part of the sharing mechanism. Petitioners offer no basis for overturning that decision. They simply argue that the add-back requirement requires them to share too much. The Commission reasonably decided otherwise.

79 F.3d at 1205-06. Well-aware of *Bell Atlantic*, petitioners make no challenge to the concept of add-back; they do not argue that add-back is inherently unreasonable, nor do they contend that it is in any way arbitrary in light of other aspects of the Commission's price cap system of regulation. Instead, petitioners present a narrow challenge, contending that the Commission's refusal to accept their 1993 and 1994 tariffs absent add-back meant that the Commission "impermissibly applie[d] the add-back rule retroactively."

Petitioners discuss the 1995 *Add-Back Rulemaking Order* throughout their brief. Petitioners' central claim is that the Commission's decision to require add-back during these tariff suspension proceedings "has the same effect as retroactively applying the 1995 *Add-Back [Rulemaking] Order*." In petitioners' view, the *Add-Back Rulemaking Order* "conceded that [the Commission] was *changing* the applicable law. . . . The FCC's understanding that it was creating a new legal

obligation in 1995 . . . is fundamentally incompatible with its newfound and opportunistic belief that add-back was always required under the just-and-reasonable requirement of section 201."

The petitioners' resort to the 1995 rulemaking in making their retroactivity argument is, in large measure, a red herring. While petitioners view the Commission's examination of whether add-back was required for just and reasonable rates under section 201 as "newfound and opportunistic," the Communications Act requires the FCC to determine whether petitioners have met their burden of showing that the 1993 and 1994 tariffs contained just and reasonable rates. *See* 47 U.S.C. § 201(b) ("All charges . . . shall be just and reasonable, and any such charge . . . that is unjust or unreasonable is declared to be unlawful . . . ."); *id.* § 204(a)(1) ("Whenever there is filed with the Commission any new or revised charge, . . . the Commission may . . . enter upon a hearing concerning the lawfulness thereof . . . . [T]he burden of proof to show that the new or revised charge, or proposed charge, is just and reasonable shall be upon the carrier . . . ."). Because the Commission did not resolve the 1993 and 1994 tariff proceedings in a manner modeling administrative nimbleness, issuing the *Tariff Order* eleven years after those proceedings began, it is true that petitioners had the benefit of seeing that the Commission would eventually promulgate a legislative rule that, according to the Commission, "clarif[ied]" whether price-cap regulation required add-back. *See Add-Back Rulemaking Order*, 10 F.C.C.R. at 5659 ¶ 15. But agencies routinely adopt rules through notice and comment that are consistent with their prior administrative proceedings. Indeed, an agency acting consistently with its prior actions is generally what makes an agency action not arbitrary, although such an action may still be unlawful for other reasons. *Cf. Nat'l Treasury Employees Union v. Fed. Labor Relations Auth.*, 404 F.3d 454, 457-58 (D.C. Cir. 2005) ("The Authority's

failure to follow its own well-established precedent without explanation is the very essence of arbitrariness."); *Williams Field Servs. Group, Inc. v. FERC*, 194 F.3d 110, 112 (D.C. Cir. 1999) ("Because FERC's decision is consistent with its precedent and well-reasoned, we uphold it."). Petitioners' argument that the Commission retroactively employed an accounting concept in rejecting their tariffs under § 204 turns not upon the Commission's later consistent rulemaking proceeding, but upon whether the Commission lawfully acted within the scope of § 204 in rejecting petitioners' tariffs, without raising retroactivity concerns.

A. *Suspension, Accounting, and Refunds under 47 U.S.C. § 204(a)(1).*

Petitioners argue that applying add-back to their suspended tariffs "impose[s] new substantive obligations that had not previously existed," "penalizes LECs for reasonable choices they made without any rule or agency guidance as to whether add-back was required," and impermissibly results in finding the 1993 and 1994 tariffs "unlawful [even though] they [did not] violate some legal rule in place at the relevant time." These retroactivity arguments ignore the elephant in the room: the suspension, accounting, and refund process authorized by 47 U.S.C. § 204(a)(1), pursuant to which the Commission acted, and its place in the ratemaking process.

As we have previously summarized:

Under section 203 [of the Act, 47 U.S.C. § 203], carriers initiate the ratemaking process by filing tariffs which may take effect after prescribed notice periods. The FCC may reject a tariff outright if it is patently unlawful. Alternatively, the Commission may set the rates for investigation and hearing. 47 U.S.C. § 204(a).

> In addition, the Commission may suspend the effective date of a filed tariff for a period of up to five months. After the five-month period has elapsed, the rates become effective, and a customer is obliged to pay at the designated rate. In the event the rates are later found unlawful, the Commission may require the carrier to effect a refund. 47 U.S.C. § 204(a).

*TRT Telecomm. Corp. v. FCC*, 857 F.2d 1535, 1538 (D.C. Cir. 1988) (citation and quotation marks omitted). If the Commission "fails to order a suspension," that failure "does not mean that the Commission cannot take action to correct an unreasonable rate." *Ill. Bell Tel. Co. v. FCC*, 966 F.2d 1478, 1481 (D.C. Cir. 1992). In "§ 205 Congress provided the mechanism for prospective relief from unreasonable rates." *Id.* at 1482. "In § 204," however, "it provided the mechanism for preventing an unreasonable rate from being filed, or at least from taking effect only subject to an accounting order and such further order as would be required. The one supposes prospective relief, the other the possibility of refund." *Id.*

Petitioners' retroactivity arguments ignore the reality that their 1993 and 1994 tariffs were suspended and subjected to an accounting order. Petitioners have been on notice, since the time those tariffs were filed, that the tariffs' lawfulness is in doubt and that they may not contain just and reasonable rates. "That a carrier is made subject to refunds, accompanied by liability for interest, is part of the price it pays for the flexibility in a scheme of carrier-initiated rates. The carrier retains the initiative to effect a rate increase, but it must account for its increased revenues if those rates are later found unlawful." *TRT Telecomm.*, 857 F.2d at 1553. This suspension process "is not unique, nor is it new." *Ill. Bell,* 966 F.2d at 1481-82 (noting that section 4 of the Natural Gas Act, ("NGA"), 15 U.S.C. § 717c, contains the same suspension and refund process, and that

section 5 of the NGA, 15 U.S.C. § 717d, like the Communications Act, authorizes prospective relief only absent suspension). And as we have explained with respect to the analogous suspension process under the NGA, suspension "changes what would be purely retroactive ratemaking into a functionally prospective process by placing the relevant audience on notice at the outset that the rates being promulgated are provisional only and subject to later revision." *Columbia Gas Transmission Corp. v. FERC*, 895 F.2d 791, 797 (D.C. Cir. 1990).

Petitioners offer two minimal responses to the fact that their tariffs were suspended under § 204—one in a footnote and one in their reply brief. Their footnote contends that "[t]o the extent the FCC's [*Tariff*] *Order* can be read to suggest that the agency has the right to create such new substantive rules in a section 204 proceeding, . . . such a rule would be unlawful because it would create the same unfair retroactive effects that the *Bell Atlantic* Court found that the 1995 *Add-Back* [*Rulemaking*] *Order* carefully avoided by applying the add-back rule only prospectively." Whatever petitioners mean by "substantive rule," petitioners cannot be right that the Commission may not suspend a tariff and then require, before accepting a revised tariff, that it comply with add-back, an accounting rule, in order to achieve a just and reasonable rate. We do not doubt that a "'failure to follow its own regulations'" during a § 204 proceeding would be "'fatal to the deviant action.'" *Way of Life Television Network, Inc. v. FCC*, 593 F.2d 1356, 1359 (D.C. Cir. 1979) (quoting *Union of Concerned Scientists v. Atomic Energy Comm'n*, 499 F.2d 1069, 1082 (D.C. Cir. 1974)). But "[§] 204 grants the FCC 'quasi-legislative authority to evaluate a carrier's proposals for new or revised rates.'" *Global NAPs*, 247 F.3d at 259 (quoting *Hi-Tech Furnace Sys., Inc. v. FCC*, 224 F.3d 781, 786 (D.C. Cir. 2000)). Given that the Commission is exercising in these tariff suspension proceedings the same authority to

evaluate whether petitioners had submitted "just and reasonable" charges that the Commission called upon in promulgating its add-back regulation, it cannot be that the FCC may not address, in determining what is a "just and reasonable" charge, various LECs having taken inconsistent positions on an unforeseen accounting issue. Rather, through these quasi-legislative proceedings, the Commission has lawfully determined that these suspended tariffs cannot be just and reasonable absent add-back, just as it did in the *Add-Back Rulemaking Order*. Petitioners alternatively contend that the FCC's order "expressly rejected" this understanding of § 204, but the record reveals otherwise.[2]

B. *Applying Add-Back to the 1993 and 1994 Tariffs was Neither Arbitrary Nor Unreasonable.*

Petitioners argue that "in all events," the "absence of guidance from the FCC in the years preceding the issuance of the *Add-Back [Rulemaking] Order*" means that "it was entirely reasonable for carriers to decide not to use an add-back methodology." That is, even if the Commission's § 204 determination was not retroactive, it was arbitrary and unreasonable for the Commission to require add-back under its

_____

[2] *See Tariff Order*, 19 F.C.C.R. at 14,957 ¶ 17 ("Section 204(a) explicitly authorizes the Commission to investigate the lawfulness of 'any new or revised charge, classification, regulation or practice' contained in a filed tariff. This broad grant of authority empowers the Commission to determine the reasonableness of applying add-back in the tariffs under investigation whether or not the Commission at the time the tariffs were filed had promulgated rules explicitly requiring add-back. A tariff investigation is a rulemaking of particular applicability under the Administrative Procedure Act and the Commission, in the exercise of its section 204 authority, routinely makes significant policy and methodological decisions based on the records developed in tariff investigations.") (footnotes and quotation marks omitted).

authority to set "just and reasonable" rates, 47 U.S.C. §§ 201(b), 204(a)(1), "given the uncertainty that characterized the law at the time and the plausible arguments against using add-back." This argument need not detain us long. Petitioners' argument is not faithful to §§ 201 and 204. Section 204(a)(1) places the burden of proving that petitioners' revised charges are just and reasonable upon the LECs, and § 201 mandates that the FCC only accept charges that are just and reasonable. The Communications Act does not contemplate that any choices the LECs make will be immunized from § 204(a)(1) and deemed "just and reasonable" absent explicit guidance to the contrary from the FCC.

We fail to see how the FCC's determination on add-back was arbitrary. Given the conflicting uses of add-back by various LECs depending upon whether add-back would contribute to their financial well-being, the Commission sought to take a uniform, fair position on add-back, and reasonably chose the position most consistent with its price cap regime. *Bell Atl.*, 79 F.3d at 1206; *see Capital Network Sys., Inc. v. FCC*, 28 F.3d 201, 206 (D.C. Cir. 1994) ("Reviewing courts accord even greater deference to agency interpretations of agency rules than they do to agency interpretations of ambiguous statutory terms."). The Commission's treatment of similarly situated LECs in the same manner was not arbitrary and capricious.[3]

---

[3] Perhaps recognizing that the suspension of their tariffs undermines their retroactivity arguments, petitioners also argue that the Commission's decision to suspend their tariffs was wrong in the first place because it conflicted, in their view, with the *LEC Price Cap Order*. Petitioners argue that under that order, "tariffs that comply with existing price-cap requirements (and thus fall within the 'bands' of lawful rates) are presumed to be just and reasonable and will not be suspended under section 204." We do not have jurisdiction to address this "no-suspension zone" challenge, however, because it was not

**IV.**

Finally, petitioners make a series of arguments claiming that it was inequitable for the Commission "to require refunds." As we have noted, the order petitioners have sought review of, and the order we have jurisdiction to review, is a liability order. It reaches a final determination that petitioners' 1993 and 1994 tariffs did not contain just and reasonable rates because they failed to utilize add-back. It does not, however, resolve the refund issue. The *Tariff Order* only orders the parties to "RECALCULATE their 1992 and 1993 earnings making such an adjustment in compliance with this order, DETERMINE any applicable sharing or lower formula adjustment . . . , COMPUTE the amount of any resulting access rate decrease, and SUBMIT PLANS for implementing *any* resulting refunds . . . ." *Tariff Order*, 19 F.C.C.R. at 14,963 ¶ 34 (emphasis added). The Commission has advised us that after the record and briefing were filed in this case, the Commission's staff, acting pursuant to delegated authority, approved refund plans submitted by BellSouth and Verizon. *See 1993 Annual Access Tariff Findings; 1994 Annual Access Tariff Findings*, __ F.C.C.R. __, 2005 WL 1661860 (Pricing Policy Division 2005). BellSouth has sought Commission review of that decision, explaining in its application for review that it "seeks Commission review . . . in order to ensure that the Commission's refund decision will be subject to judicial review if the D.C. Circuit concludes that review is not available until the Commission issues an order specifying the precise amount that BellSouth must pay in refunds." *See Int'l Telecard Ass'n v. FCC*, 166 F.3d 387, 388 (D.C. Cir. 1999) ("'[t]he filing of an application for review [by the full Commission] shall be a condition precedent to judicial

---

"raised . . . with sufficient clarity before the FCC." *Am. Family Ass'n, Inc. v. FCC*, 365 F.3d 1156, 1166 (D.C. Cir. 2004) (citing 47 U.S.C. § 405(a); *AT&T Corp. v. FCC*, 317 F.3d 227, 235 (D.C. Cir. 2003)).

review of any order [. . .] taken pursuant to' delegated authority") (first and second alterations in original) (quoting 47 U.S.C. § 155(c)(7)).  No party has advised the Court of what action, if any, Verizon took in response to the staff decision.

Needless to say given our prior discussion of our appellate jurisdiction to review the Commission's lawfulness determination, *see supra* Part II, the *Tariff Order*, from which Verizon and BellSouth petitioned for review, is not the Commission's final determination regarding refunds.  Because the petitions for review do not seek to challenge a final agency action on refunds, we do not have jurisdiction to consider petitioners' premature challenge to any future resolution of the refund issue.  *See* 47 U.S.C. § 402(a); 28 U.S.C. §§ 2342(1), 2344; *see also Verizon*, 269 F.3d at 1112 ("[T]he FCC has not reached a conclusive determination that it will compel the LECs to return all of the monies that they collected . . . .  We will not prejudge these issues in advance of the agency.").

**V.**

For the foregoing reasons, we deny in part and dismiss in part the petitions for review.

*So ordered.*